CASONE *v.* STATE.

*(Nashville,* December Term, 1951.)

Opinion filed February 9, 1952.

Petition for Certiorari denied by U. S. Supreme Court June 2, 1952.

GROVER N. MCCORMICK, of Memphis, for plaintiff in error.

Knox Bigham, Assistant Attorney General, for State.

Mr. Justice Burnett delivered the opinion of the Court.

Casone was convicted of the bribery of a professional boxer with his punishment fixed at confinement in the Shelby County Penal Farm for a period of 11 months and 29 days. This conviction was for the violation of Chapter 143 of the Public Acts of 1949, carried in the supplement to the Code as Section 11102.2.

From a rather large record for such cases, around five hundred pages of testimony, we gather the facts as follows: A codefendant of the plaintiff in error arranged for certain professional boxing matches to be conducted in Memphis on the night of November 21, 1950. The principals in these fights were one Scott against one Buchanan and one Burke against one Barrom. Scott arrived in Memphis on November 19, and was assigned to room No. 409 at the Gayoso Hotel. On November 20, Scott went with the promoter of the fights to another suite of rooms on the same floor and there met the plaintiff in error. On this occasion the three parties discussed a car lot that the plaintiff in error was to put in, evidently in Memphis. Scott the fighter, testified that he gathered the impression that he might possibly work in this car lot. The indictment charges the plaintiff in error with the bribery of Scott. During this conversation

there was no discussion of the outcome of the fight. Scott the fighter testified that later that day, at about 7:00 o'clock in the evening of November 20, he and the promoter went from his room to the room of the plaintiff in error and met the plaintiff in error there. Scott says that on this occasion Burke, Buchanan, Barrom, the promoter and the plaintiff in error were all present. In the course of the conversation among these people it was suggested by someone that if it was known how the fight would come out a lot of money could be made. To this suggestion Scott the fighter replied that he didn't think enough money could be made to cause a thing like that. The plaintiff in error stated, according to Scott, that five thousand dollars or so could be called. It was suggested that the odds would be two or three to one in Scott's favor, and that Burke, another fighter, would be favored over Barrom. Arrangements had been made for the promoter to referee the fights. This promoter as aforesaid was present in this room according to Scott and other testimony which will be later referred to, and while these parties were in this room the plan of throwing the fight was arranged and it was practiced for Scott and Buchanan to square it off and then the promoter was to step in between them and as he did so Scott was to step back and at this time the other fighter was to throw a punch at Scott and Scott was to go down. All of this was to occur in the third round. This procedure was rehearsed there in the hotel room. Scott further testified that it was arranged between him, the plaintiff in error and the promoter for him, Scott, to receive his share of the gate receipts plus one-third of the bets put down. The plaintiff in error was to make the bets. Scott testified that the fight did end in the third round as planned,

but that he received a broken vertebra in his neck, which was not planned.

Scott's opponent in the fight, Buchanan, testified substantially in accord with that related above which was given by Scott, except that Buchanan did not remember whether the plaintiff in error was present in the room when the arrangements were made that the fight be thrown. This witness testified that he was promised no additional money for his part in the fraud, but that the promoter told him that they could put on a good show for spectators and thereby enhance future gate receipts. It was also shown that he did not have the experience and reputation of Scott and that by knocking Scott out his reputation would be enhanced.

A third fighter, Burke, corroborated Scott as to the matters occurring in the plaintiff in error's room on the night of November 20, and stated very positively that the plaintiff in error was present when the arrangements were made and when the fight participants rehearsed the fight to be put on. He also stated that it was arranged for him to lose to Barrom in the third round of their fight, and that he did lose in the third round according to the prearranged plan. For his participation in the fights Burke was to get a certain percentage of the bets, this percentage being guaranteed by the promoter to be at least $700. (Burke testifying that there was a $700 mortgage on his car which they told him at the time could be lifted for what he would make out of his participation in the thrown fight). Burke testified that the plaintiff in error was to make the bets and that the plaintiff in error said that he would have at least $15,000 on him. After the fights were over the plaintiff in error in the same room at the Gayoso Hotel according to Burke, paid Burke $175. He stated that the plaintiff in error said

that the reason the amount was so small was that he could not get many bets.

One witness testified that he attended the fight and bet $300 with the plaintiff in error on Scott to win. No odds were given in this wager. This witness also saw the plaintiff in error at the ringside betting with another man. This witness testified that Scott and Buchanan in their fight were not trying to fight. He stated that Scott went down three times in the third round. The first time he went down he had received only a light blow. The second and third times that Scott went down he hadn't even been hit by Buchanan. This witness further testified that according to the records Scott should have been the best fighter.

Another witness who attended the fight bet $250 to $150 with the plaintiff in error that Burke would win over Barrom. This witness testified that he sought out the plaintiff in error and picked his own man to bet on. Four other witnesses all of whom had been rather intimately associated with boxing over a period of years, from five to thirty-five years, testified that they witnessed the boxing matches on this night and that in their opinion neither the Scott-Buchanan fight nor the Burke-Barrom fight was a legitimate contest. One of these witnesses had bet $10 with the plaintiff in error on Scott to win.

The Tennessee Athletic Commission conducted an investigation of these .fights and gave each of the four boxers an opportunity to be present and testify. Scott declined to attend but did write a letter to the Chairman of the Commission denying that his fight was fixed. Buchanan testified before the Commission and denied that the fight was fixed. On this trial Scott repudiated the statement in his letter to the Commission, and Buchanan testified that his testimony before the Com-

mission was not true. The investigation was started by the Commission at the suggestion of the Inspector of. Boxing for the State and others who suspected that the fights were not on the up and up.

The plaintiff in error testified in his own behalf and denied that he was guilty of bribery. He claimed that it was merely fortuitous that his room at the Hotel was so near that of Scott, stating that he took a suite in the Hotel that had been reserved for a friend named Richardson. He denied that any of the events described by the three boxers occurred in his room on the night of November 20. He relied upon an alibi to the effect that on the night of November 20, and at the time of the alleged bribery arrangements, he was in Truman, Arkansas, visiting Earl Moon and his family. He stated that Moon had been in Memphis two days before the trial but that his mother had become sick and that Moon had accordingly had to go to Cleveland, Ohio. The plaintiff in error admitted being present at the fights and making bets totaling about $800, but denied any knowledge of a fix. He further denied that he paid McRae $175 in his room after the fight. He further showed that he was the owner of some considerable property in Memphis and maintained an apartment where he lived in that City. He admitted on cross-examination that he had owned an interest in some restaurants and betting houses.

The promoter and referee of the fight who was also indicted along with the plaintiff in error, took the stand on his behalf and denied that he was in the plaintiff in error's room on the night of November 20, when the fights were allegedly fixed. He denied that he participated in or knew anything about any bribery, that he saw the plaintiff in error on the night of November 20, and that he had any knowledge that the boxing matches were any-

thing but legitimate. This codefendant of the plaintiff in error was convicted and given 30 days which according to statements made at the bar had been served by him.

In rebuttal the State introduced one of its Assistant District Attorney Generals as a witness. On direct examination this witness testified that he went to Truman, Arkansas, after he heard the plaintiff in error's testimony to the effect that he was in Truman on the night of November 20. This witness said that he saw Earl Moon in Truman and invited the latter to return to Memphis with him but that Moon did not come. This testimony of the Assistant District Attorney General was not objected to. On cross examination and in response to questions propounded by counsel for the plaintiff in error this witness testified that Moon stated that he had no recollection of the plaintiff in error being at his home on the night of November 20; that none of his family was ill and none of his or his wife's relatives lived in Cleveland, Ohio; and that the plaintiff in error had had several conversations with him trying to get him to come to Memphis and provide an alibi.

The first assignment is that the evidence preponderates against the verdict. The plaintiff in error is here under a presumption of guilt. From a statement of facts presented to the jury, heretofore set forth, a fact question was "squarely presented to the jury, and their decision of the credibility of the several witnesses whom they saw and heard, is final under the circumstances here." *Christian* v. *State*, 184 Tenn. 163, 164, 197 S. W. (2d) 797.

Along with and closely allied with this assignment is the fourth assignment, which is to the effect that the conviction is based upon the uncorroborated testimony of accomplices. The testimony of the three boxers is

severely criticized as being fantastic and unworthy of belief. It is argued, and very forcibly urged, that this testimony is further weakened by the fact that these fighters testified under compulsion and duress in an effort to avoid criminal prosecutions themselves. We have very carefully read this large record and are satisfied that these matters largely addressed themselves to the attention of the jury who determined the credibility of these various witnesses who testified. All of these State's witnesses were subject to a double-barrel cross examination by two very able lawyers, one representing the plaintiff in error and one representing his codefendant. All witnesses were severely grilled for many pages in this record. The question of credibility, having been resolved by the verdict against the contention of the plaintiff in error, it is now concluded.

 The question of whether or not the conviction rests upon uncorroborated testimony of accomplices is interesting and probably a close one. In seems to us after reading the excellent briefs and making an independent investigation of the matter that the other fighters who were present in the room of the plaintiff in error and testified, that is, the fighters other than Scott the one that the plaintiff in error is indicted for bribing, were not accomplices of Scott in this bribery. The test to be applied as to whether or not one is an accomplice is whether the alleged accomplice can be indicted for the offense. 14 Am. Jur., page 840, Section 110. None of these other fighters were either a principal or an accessory in the bribery of Scott. There is absolutely no evidence that the fighter Burke encouraged or assisted the plaintiff in error to bribe Scott. He was merely present when the crime was committed. It is said that the term "accomplice" cannot be used in a loose or

popular sense so as to embrace one who has guilty knowledge or is morally delinquent or who was even an admitted participant in a related, but distinct offense. *Stone v. State*, 118 Ga. 705, 45 S. E. 630, 98 Am. St. Rep. 145; Wharton's Criminal Evidence, Vol. 2, page 1229, Section 732. We note that in Wharton's, supra, the following statement is made: "When several persons bet at a gambling game of faro, pool, or monte, each is guilty of betting at a gambling table or bank exhibited for the purpose of gaming as several, not joint, offenders; hence, each is not an accomplice of the others." We therefore conclude that these fighters who testified as to what took place in the plaintiff in error's room, other than the fighter whom the plaintiff in error is accused of attempting to bribe, are not accomplices and that their testimony is a sufficient corroboration of the testimony of Scott. We therefore have in corroboration of the testimony of Scott, the testimony of the fighter Burke, the plaintiff in error's admitted occupancy of the room where the crime is supposed to have occurred, his admitted meeting of Scott in the lobby of the Hotel during that day, his admitted presence at the fight and betting in excess of his usual wagers, and the testimony of the State offered to the effect that the plaintiff in error's bets were placed on the winners in those fights who were according to all of the testimony not the favorites. This corroborating evidence clearly meets the requirement as to sufficiency as laid down by this Court in *Stanley v. State*, 189 Tenn. 110, 222 S. W. (2d) 384.

The second and third assignments complain of the action of the lower court in failing to direct a verdict. The failure to direct a verdict in a criminal case cannot be made the basis of an assignment of error. *Taylor v. State*, 191 Tenn. 670, 683, 235 S. W. (2d) 818.

■ The fifth, sixth and seventh assignments allege that the trial court erred in permitting certain of the State's witnesses to express their opinions as to the legitimacy of the two fights. It is very earnestly and ably argued that these witnesses were not properly qualified, and that the trial court did not pass on their qualifications, and that the matters about which they testified were not properly subjects of expert testimony. "Two things must occur to justify the admission of the testimony of an expert witness. First, the subject under examination must be one that requires that the court and jury have the aid of knowledge or experience such as men not specially skilled do not have, and such therefore as cannot be obtained from ordinary witnesses. Second, the witness called as an expert must possess the knowledge, skill, or experience needed to inform the court and jury in the particular case under consideration. Upon such a question such a witness may be called, and may testify not only to facts, but to his conclusions from the facts, because the court and jury are without the knowledge necessary to enable them to draw the conclusions for themselves without aid.—Expert evidence is not confined to classified and special professions, but is admissible wherever peculiar skill and judgment applied to a particular subject are required to explain results by tracing them to their causes. Expert opinion evidence has been admitted upon a variety of subjects." Wharton's Criminal Evidence, Section 948, page 1663.

These statements are supported by authorities cited in the text and certainly sound very logical and convincing to us. This Court approved an almost identical statement in *Cumberland, Telegraph & Telephone Co.* v. *Dooley*, 110 Tenn. 104 at page 109, 72 S. W. 457. The Court on various instances since the establishment of

314

the State has admitted expert testimony in various and sundry situations. One of which is found in *National Life & Accident Ins. Co.* v. *Follett,* 168 Tenn. 647, 662, 80 S. W. (2d) 92.

█ The two Tennessee cases last above referred to are of course civil cases. The quotation which we quoted from Wharton is applicable to criminal cases. We are satisfied that the authority of the two Tennessee cases is at least persuasive favoring the admissibility of the opinions offered in the instant case. The issue before the jury was the question whether Scott and Burke were actually knocked out or whether they faked and threw their respective fights. In order for this question to be answered it would be necessary to know the force of the alleged knock-out blow, the number of inches that the blow traveled, the exact point of impact, the amount of punishment the fighter receiving the blow had previously received and his resulting condition, and the state of mind of both fighters. All of these factors, plus many more, entered into the problem. It is readily seen that it is a matter of impossibility for any witness to describe with the necessary degree of precision all of the many elements that must be considered before the question can be adequately answered. It thus seems that it was reasonable and fair that the jury receive from these witnesses who had served in various and sundry official capacities as promoters, referees and what not, for a period from five to thirty-five years in boxing (they saw this fight) to express an opinion thereon. One of these witnesses was the State Inspector of Boxing who initiated the investigation of this fight. The witnesses prior to expressing an opinion related the facts of what happened and why it was their opinion that the fight was thrown. It therefore seems to us that this testimony was com-

petent and that the objection to it would go merely to the weight of the testimony. This testimony was clearly further corroboration of Scott and the other witnesses' testimony as to the result of a prearranged plan made in the plaintiff in error's room.

By the eighth assignment the plaintiff in error raises a constitutional question and lays a predicate for the Supreme Court of the United States to take jurisdiction of this case should it be affirmed by this Court. By this assignment the plaintiff raises the question that the testimony of the Assistant District Attorney was inadmissible because the plaintiff in error was in effect having testimony given by the Assistant District Attorney for one who was not present in court and testifying against the plaintiff in error. This testimony given by the Assistant District Attorney on direct examination was not objected to. The testimony simply was that he had been across the State line into Truman, Arkansas, and there had seen Moon and had invited Moon to return to Memphis and Moon did not come. The plaintiff in error had previously testified that Moon would support his alibi but had had to leave on account of sickness. On direct examination this Assistant District Attorney did not purport to repeat a single statement that Moon had made to him. It certainly cannot be said that this testimony was hearsay. Its only effect was to impeach the plaintiff in error to the extent of showing that Moon was possibly available as a witness if he the plaintiff in error chose to call him. Under our authorities the plaintiff in error cannot now complain about the admissibility of this testimony because he made no objection to it on the trial. *Troxell* v. *State*, 179 Tenn. 384, 166 S. W. (2d) 777. According to an annotation in 104 A. L. R. at page 1130 ''it has been held almost universally

that when hearsay testimony is admitted without objection it may probably be considered and given its natural probative effect as if it were in law admissible, the only question being with regard to how much weight should be given thereto.'' Following this statement of the annotator are a list of cases from the United States Supreme Court and practically every State in the Union with the apparent exceptions of only four or five—Tennessee does not come within these excepted cases. Merely because a claimed or even a real constitutional right might be involved does not ·excuse the plaintiff in error from raising this question on the trial and does not allow that question here because it now comes too late. *Troxell* v. *State,* supra.

Of course the real damaging testimony given by this Assistant District Attorney was in response to questions on cross examination by counsel for the plaintiff in error. When these things are brought out by the party complaining he cannot complain of his own act. *State* v. *Becton,* 66 Tenn. 138. It seems, too, that by this cross-examination of the Assistant District Attorney this testimony offered further corroborative evidence of the plaintiff in error's participation in this bribery because it leads to the inference that the plaintiff in error was attempting to manufacture a false alibi.

By the ninth assignment of error it is insisted that the trial judge erred in instructing the jury that they could sentence the plaintiff in error to jail for less than a year. This charge was correct. The statute under which the plaintiff in error was indicted provides a minimum sentence of one year in the penitentiary. Code, Section 10754 authorizes the jury to punish by confinement in the county jail for less than one year when the minimum penalty for the offense is confinement in the

penitentiary for one year. *Miller* v. *State*, 189 Tenn. 281, 225 S. W. (2d) 62, 15 A. L. R. (2d) 1076.

We have very carefully considered this record and all the authorities and have taken a great deal of interest in the matter and are convinced that the plaintiff in error is guilty and there is no reversible error in the record. It must therefore be affirmed with costs.