John Henry **SNOWBALL**, Plaintiff in Error,

v.

**STATE** of Tennessee, Defendant in Error.

Court of Criminal Appeals of Tennessee.

Oct. 6, 1971.

Certiorari Denied by Supreme Court
Jan. 3, 1972.

James L. Jones, Knoxville, for plaintiff in error.

David M. Pack, Atty. Gen., Charles W. Cherry, Asst. Atty. Gen., Nashville, John T. O'Connor, Asst. Dist. Atty. Gen., Foster D. Arnett, Special Prosecutor, Knoxville, for defendant in error.

## OPINION

OLIVER, Judge.

John Henry Snowball, the defendant below, convicted of robbery in the Criminal Court of Knox County and sentenced to not less than five nor more than 12 years in the penitentiary, has duly perfected his appeal in the nature of a writ of error to this Court.

By his first, second and seventh Assignments of Error, the defendant challenges the sufficiency of the evidence to warrant and sustain the verdict of the jury. The law is well settled in this State, and has been reiterated in numerous cases, that a guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State. Such a verdict removes the presumption of the innocence of the accused which stands as a witness for him until he is convicted, and raises a presumption of his guilt upon appeal, and he has the burden upon appeal of showing that the evidence preponderates against the verdict and in favor of his innocence. Gulley v. State, 219 Tenn. 114, 407 S.W.2d 186; Jamison v. State, 220 Tenn. 280, 416 S.W.2d 768; Webster v. State, Tenn.Cr.App., 425 S.W.2d 799; Brown v. State, Tenn.Cr. App., 441 S.W.2d 485; Palmer v. State, Tenn.Cr.App., 435 S.W.2d 128; Morelock v. State, Tenn.Cr.App., 460 S.W.2d 861.

We summarize the material evidence. Interested in buying some cattle, 67-year-old G. R. Bailey went to Halls Stockyard in Knox County the morning of April 3, 1968. There a man known to him only as Raymond Jacques represented that he and the defendant owned an unattended truck load of cattle which Bailey had examined with particular interest. When Jacques informed the defendant of Bailey's interest, the defendant said, "That man hasn't got any money, there ain't no need in fooling with him." Noticing Bailey's bank book in his shirt pocket, Jacques removed and examined it and said, "Yes, he's got money." Favorably considering Jacques' price quotation for the cattle, Bailey announced that he would go to the Magnolia Avenue Branch of Home Federal Savings & Loan Association bank (a distance of some eight or 10 miles) and get some money; Jacques accompanied him. After borrowing $5000, Bailey and Jacques returned to the stockyard. After Bailey parked his car in a parking area he became suspicious when he saw the defendant and two more men approaching, and locked all four doors of his Plymouth station wagon. Jacques promptly unlocked the doors stating, "They're not going to harm you," and the defendant got in the back seat. The other two men took positions outside. "One of them stood on the right hand side of the car, and the

large, husky fellow stood over on the left hand side of the car against my door." Then the defendant produced three plastic bottle caps and a foam rubber ball, small enough to be completely covered and hidden under one of the caps, and ostensibly started a gambling game with Jacques. In this confidence game the small ball is placed under one of the caps and, after their positions are completely shuffled and altered several times, the participants bet as to which of the caps conceals the ball. When this maneuver started, Jacques whispered to Bailey, "That fellow's got a pocket full of money and I'm going to get it" and told Bailey to put down $500. When Bailey refused saying, "No, you're not gambling with my money, I've worked too hard for this money," the accomplice standing beside the station wagon door on the driver's side began "punching me while he was trying to get me to put my money down. I don't know whether he was punching me with his finger or a gun barrel." When Bailey kept stalling, Jacques again demanded that he put down $500. Bailey testified, "Well, I was afraid not to, and I did." When Jacques picked up the wrong cap and lost, he then told Bailey, "Put down one thousand, double it." Bailey refused and the man standing beside his car door again started punching him and Jacques again demanded, "Put it down there, if I lose I'll write you a check." Bailey testified, "I seen I was to the place where I was in the middle of trouble, and to save my hide, I put down a thousand dollars. They wrangled around there and he lost again." Then the defendant told Bailey to put the rest of his money in a sock and said he was going to put the other money in there with it and "We are going to show you that we are half way decent." Bailey put $3500 in the sock and when he held onto it as the defendant started pulling it away from him, Jacques told him, "Turn it loose, so he can fix it." The defendant then gave Bailey a similar sock which contained only two packs of cigarettes. Having taken Bailey's entire $5000, Jacques and the defendant and the other two accomplices left. During all this transaction, the two accomplices maintained their posts at the doors of Bailey's car. He testified that he was afraid not to do as he was instructed. "I was scared to death, to tell you the truth." Bailey next saw the defendant in the Monroe County Jail at Madisonville about eight months later. At that time the defendant offered to return Bailey's money if he would refuse to identify him and allow him to get out of jail, and also threatened Bailey's family and his property if he refused to cooperate. He denied seeing the defendant and others engaged in gambling before he went to the bank, and also that he participated in the game at any time.

The defendant testified that he is a gambler and went to the Halls Stockyard on April 3, 1968 for the purpose of gambling; that accompanying him were his girl friend, a Negro named Alger Harris and a white man named Ira J. Bates, who was loaning him money and "he's what I call the bank-roll man"; that he is from Birmingham and Alger Harris is from Birmingham and Bates is from Gardendale, Alabama; that he keeps up with cattle sales and goes from one to another, and "I've got a book for every one in the United States," and also works automobile auction sales and any place, where a crowd gathers; that he and Alger Harris "were playing what they call the shell game, it's also known as the 'greasy pig,'" involving three bottle caps and a small ball, when Ira J. Bates walked up with Bailey; that upon request Bailey changed a twenty dollar bill for him; that he had been operating this game 35 years; that "The ball is always under one of the tops. If you pick up the top that the ball is under, you win; if you pick up the top that the ball is not under, you lose. It's a slight of hand"; that Bailey got into the game and lost four or five hundred dollars which he borrowed from Ira J. Bates—stating that he had money in the bank; that "I told him he didn't have no money in the bank, I didn't believe he could pay the man the five hundred dol-

lars. He told me I didn't know who I was talking about, said he had about twenty thousand dollars in the bank and he said to prove that I was wrong, he would go to the bank and get five thousand dollars"; that he then bet Bailey he couldn't get $5000 out of the bank, and that Bailey and Bates went to the bank and when they returned, Bailey had $5000 and said he had repaid the $500 to Bates but actually didn't do so. Snowball testified that Bailey went to the bank to get money to buy cattle, and also that he went to get the money to gamble with, and also that he went to get the money to repay Bates; that he got in the back seat of Bailey's car and they started the game again, "Him and the other fellow [Bates] was on the front seat. Two more fellows come up there along the side, and they was in the game, too. They was betting just like Mr. Bailey was"; that Bailey first bet $500 and lost, then bet and lost $1000, and the next time he bet and lost all he had left of the $5000; that the man [Bates] on the front seat with Bailey was "what you call the come-on man. . . He's the one that tied them up to bet the money." The defendant described how people are induced to play: "To get them to playing in a game, you don't never know if a man's got any money or not, so you ask them to change twenty dollars, and if they change a twenty dollar bill, you just start gambling, you and the other fellow start gambling. Quite naturally, they want to see what you are doing. Once they look at it, they think it's something easy, and they think they are going to get something for nothing. They jump in then and lose their money, and then they will holler robbery, he'll holler most anything to try to get his money back." He denied that any sock was involved and that Bailey was threatened and robbed. He said Jacques was not with him in Knoxville but was with him later when they were both arrested in Clinton and taken to the Madisonville Jail; that Jacques operates a filling station in Montgomery, Alabama and "He wanted to join" after the defendant beat him out of some money and "When we run short a man sometimes, we carry him with us and he'd bet in the game." The defendant also testified that he offered to pay Bailey his money back; that "Nine out of ten will take the money back, that's all they want, their money back. When they get in there trying to win my money, and they find out they lose their money, then they holler something to get their money back, and most of the time, to keep from going through this procedure, I will give them their money back.

The defendant's attorney testified that on April 1, 1970, at his request, Bailey came to his office and talked to him about the incident and signed a long-hand statement (prepared by the attorney) reciting that when he and Jacques walked around the stock barn the defendant was operating a shell game on the running board of an old truck, that after he returned from the bank with the money and they were playing the game in his station wagon the defendant and Jacques were nice to him and did not threaten to harm him in any way, that there was no violence or force used against him at any time, and that he was not robbed or assaulted and the money was not stolen from him.

As the sole and exclusive judges of the credibility of the witnesses and of the weight to be given their testimony, the jury by its verdict rejected the defendant's testimony and contentions about what occurred and accepted the State's theory and evidence. The defendant has failed to carry his burden of demonstrating here that the evidence preponderates against the verdict and in favor of his innocence.

There is no merit in the defendant's Assignment of Error complaining that over his objection the court admitted the testimony of W. C. Mason regarding another alleged crime committed by the defendant and for which he had not been convicted. Sixty-eight-year-old W. C. Mason testified that on December 9, 1968, a stock sale day, the defendant approached him at the Madisonville, Tennessee Stockyard and asked

for change for a twenty dollar bill; that as he complied with this request, giving the defendant two tens for the twenty, two young white men and a colored man gathered around him; that the defendant and the other colored man then began playing a game on the running board of the truck, using three bottle caps and a small ball, which they called "pig in a pen"; that he had never seen any of those men before; that one of the white boys talked him into loaning him $40 and promptly lost it in the game, and then said he was unable to repay it; that the defendant then remarked to the other white man, "I bet you couldn't raise $5000," the man agreed that he could not, and the defendant then asked Mason whether he could raise that amount; that he told the defendant that he could but was not going to do so, and that he lived in Athens and was in a hurry to get home; that, incredible as it may seem, the other white man so appealed to his sympathy with a story that they were just poor country boys and had lost some money which they were not financially able to lose, that Mason agreed to go to his bank in Athens, Tennessee, some 22 miles from Madisonville, and withdraw $5000; that they made the trip in this white stranger's automobile and when they returned to the Madisonville Stockyard the defendant and the other colored man and both the white men gathered around him and "I slipped it (the envelope containing the money) kind of out of my pocket up under my coat sleeve, it was a pretty big full sleeve," and that the white man who had remained at the stockyard "reached over and got my money"; and that the two colored men (the defendant and the other one) got in a car and drove south on U.S. Highway 411 and the two white men drove north on the same highway.

Obviously, the defendant and his accomplices were engaged in exactly the same type of operation at the Madisonville Stockyard that they had practiced upon Mr. Bailey at the Halls Stockyard in Knox County, and which the defendant testified he had been practicing for 35 years, and

which he demonstrated before the jury during his trial. The trial judge instructed the jury that they could not consider Mason's testimony as any evidence of the defendant's guilt and could consider it only upon the question of the defendant's identity and his knowledge and intent with respect to the offense involving Mr. Bailey.

The rule governing admissibility of evidence of other crimes not charged in the indictment is so well established that it is common knowledge in the legal profession, and has been stated and applied in a great variety of factual contexts by the Supreme Court of this State. It is a well-established common-law rule that in a criminal prosecution proof which shows or tends to show that the accused is guilty of the commission of other crimes and offenses at other times, even though they are of the same nature as the one charged in the indictment, is incompetent and inadmissible for the purpose of showing the commission of the particular crime charged, unless the other offenses are connected with the offense for which he is on trial. But the rule has its well-known exceptions. Such evidence is admissible when it is relevant to prove some other material issue on trial; for instance, when it tends to establish (1) motive; (2) intent; (3) absence of mistake or accident; (4) a common scheme or plan for commission of two or more crimes so related to each other that proof of one tends to establish the other; and (5) the identity of the defendant on trial. Pruitt v. State, Tenn.Cr.App., 460 S.W.2d 385, and authorities therein cited.

Beyond that, however, the defendant testified in detail concerning the same occurrence. He said that Alger Harris and Ira J. Bates and another white man named Theodore Edwards were with him; that they were operating the same game and that Mr. Mason loaned or gave his money to one of the men who lost it for him in the game. By so detailing his version of the incident involving Mr. Mason, his testimony cured any conceivable error

committed, if in any view there was any such, in admitting the testimony of Mr. Mason. Lester v. State, 216 Tenn. 615, 393 S.W.2d 288; Batchelor v. State, 213 Tenn. 649, 378 S.W.2d 751.

■ For like reasons, the defendant's complaint about admission of testimony of Monroe County Sheriff Davis, relating to the defendant's arrest for another crime and statements allegedly made by him while in custody, is wholly untenable. Sheriff Davis testified that on December 12, 1968 the defendant was arrested in Anderson County and was brought to the Monroe County Jail in connection with the Mason incident; that at the defendant's request he was permitted to make a telephone call to Birmingham, Alabama and asked the person he was talking to to send him $5000 and he could get the Mason charges dropped; that he then remarked to the defendant, "What about this gentleman from Knox County," referring to Mr. Bailey, who was present at the jail when the defendant was brought in; that the defendant replied, "Yes, I recognized him when I come in," and then the defendant told the person to whom he was talking to send $10,000; and that then, at the defendant's request, Mr. Bailey went back to his cell and they had a conversation. The court promptly instructed the jury to disregard so much of the sheriff's testimony as related to the defendant's telephone conversation about the Mason case. As already noted, the defendant gave a detailed account of his version of the Mason affair, and also testified that he offered to repay Mr. Bailey. And, with reference to the Birmingham telephone call, the defendant testified that he made the call to get some money to make a bond but did not ask for $10,000, and that he and Bailey had a conversation in the Monroe County Jail. He also testified that he and Jacques were arrested in Clinton (Anderson County), "for being at the stock barn, but it was nothing out of this. Somebody told them I was the one that goes around and gambles at the stock barns," and were taken to the Monroe County Jail.

Moreover, notwithstanding the trial court had already expressly instructed the jury to disregard that portion of the sheriff's testimony, defense counsel cross-examined Sheriff Davis in detail and with particular reference to Snowball's statement in his telephone conversation that he could get the Mason charges dropped for $5000. Thus, even if the trial judge had not instructed the jury to disregard that portion of the sheriff's testimony and even if it could be said it was inadmissible, which in the context of the total record we do not say, any error was cured when defense counsel again delved further into and developed the subject on cross-examination of the sheriff. Marable v. State, 203 Tenn. 440, 456, 313 S.W.2d 451; Casone v. State, 193 Tenn. 303, 246 S.W.2d 22.

■ Upon careful consideration of this record, we find no merit in the defendant's contention that the trial court erred in failing to admit into evidence the long-hand statement written by defense counsel and signed by Mr. Bailey. Testifying as a defense witness, the defendant's attorney was permitted to read from that statement, as indicated above, the portions inconsistent with Mr. Bailey's testimony.

■ Upon this record, the jury was wholly justified in finding that the defendant and his partners in crime robbed Mr. Bailey of $5000 "by violence or putting the person in fear." TCA § 39–3901. The statute is to be applied in an alternative fashion to both the taking of goods by violence or to taking by putting the person in fear. "Our statute provides that robbery is committed either by means of violence or by fear. In many robberies both violence (force) and fear are present, but only one of these elements is necessary, either being sufficient to constitute the crime." James v. State, 215 Tenn. 221, 385 S.W.2d 86.

■ Finally, we must reject the defendant's complaint that the jury verdict was

excessive and was the result of caprice, passion and prejudice created by the testimony of Mr. Mason and Sheriff Davis. The statute fixes the penalty for robbery at imprisonment in the penitentiary for not less than five nor more than 15 years. The defendant's punishment being within the statutory limits (T.C.A. § 39–3901), his insistence that it is excessive cannot be sustained. Hunter v. State, 222 Tenn. 672, 440 S.W.2d 1; Yearwood v. State, Tenn. Cr.App., 455 S.W.2d 612.

The judgment of the trial court is affirmed.

DWYER and O'BRIEN, JJ., concur.