**Billy Dean WILLIAMS, Plaintiff in Error,**

**v.**

**STATE of Tennessee, Defendant in Error.**

Court of Criminal Appeals of Tennessee.

Oct. 17, 1974.

Certiorari Denied by Supreme Court

Feb. 18, 1975.

Fletcher L. Ervin, Mayfield, Mayfield & Basham, Cleveland (Appointed), David S. Humberd, Fillauer, Dietrich & Mobbs, Cleveland (Appointed), for plaintiff in error.

Milton P. Rice, Atty. Gen., Robert H. Roberts, Advocate Gen., Nashville, Richard Fisher, Dist. Atty. Gen., Cleveland, for defendant in error.

## OPINION

OLIVER, Judge.

Three separate indictments charged the defendant Williams with the first degree murder of Ralph Daugherty, Ralph Daugherty, Jr., and Geneva Jones Daugherty, his father-in-law, brother-in-law, and mother-in-law, respectively. Tried upon the three indictments simultaneously by agreement, Williams was convicted of first degree murder in each case and received three consecutive 99-year penitentiary sentences. Through his two appointed attorneys he has duly perfected an appeal in the nature of a writ of error to this Court.

The ninth, tenth and eleventh Assignments of Error urge the defendant's contention that the evidence is insufficient and preponderates against the verdicts. The evidence is wholly circumstantial. It was generally understood that Ralph Daugherty often carried a considerable amount of money, and it was shown that two days before the homicides he had 17 one hundred dollar bills and other smaller bills on his person. No money was found on his body or in the house, except about $200 found under a brick in the hearth.

Between 7:00 and 8:00 a.m. on Sunday, March 5, 1972, the defendant drove up to the home of Alex Daugherty, father of the deceased Ralph Daugherty, who lived about a quarter of a mile from Ralph

Daugherty's home, and asked if he knew where Ralph was and left upon receiving a negative reply. When Alex Daugherty first noticed the defendant's car it was on the road about even with the driveway leading to Ralph Daugherty's home; but he didn't know whether the defendant was coming out of that driveway or just driving up the road. The elder Daugherty also testified that Ralph owned a .22 caliber pistol which he kept on a little table in the kitchen when it was not in his truck. Ralph and his wife and their son Ralph, Jr. were shot to death in their home. Ralph was lying in the kitchen and his wife and son in the dining room. The county medical examiner found that Ralph had been shot six times, his wife three times and the son five times, and was of opinion they died about 7:00 o'clock the same Sunday morning, and that the wounds were made by two guns of different caliber.

Four .38 caliber commercial wad-cutter bullets and five .22 caliber bullets removed from the bodies of Mr. and Mrs. Daugherty and found in different parts of the house (none were removed from the son's body) were examined by the Tennessee Bureau of Identification Firearms Examiner. He found that the .38 caliber bullets were all fired from the same gun, having rifling marks of a Smith & Wesson revolver; and that some of the .22 caliber bullets were of the same type as those in .22 caliber cartridges found in Ralph Daugherty's truck. The defendant owned a .38 caliber Smith & Wesson revolver and the day before these murders he was carrying it at his step-father's house where he kept a box of factory made wad-cutter cartridges; and he had that box of ammunition in his hand at that time. Neither his gun nor Ralph Daugherty's .22 revolver was ever seen after these homicides. During the course of the investigation immediately after authorities were notified of the tragedy, the county coroner said to the sheriff, "I don't seem to find any gun that was used in this." Hearing that remark, the defendant said, "Well, I don't know anything about

any guns and I don't have any guns on me. If you don't believe me, search me." When the coroner turned and looked at him, the defendant said: "I'm sorry I flew off the handle."

Arising early on Sunday morning March 5, 1972, as was his custom, the defendant left the house and returned about 9:30 and awakened his wife. They had planned to have Sunday dinner with her parents. Between 11:00 and 11:30 the defendant took his wife and child and drove to her parents' home. While she was removing from the car items of food she had brought and the child's toys, the defendant took the child and went ahead to the front door, which had been broken open. When he looked inside he turned and yelled to his wife not to come to the door. He returned to the car and they drove to neighbor Jim Jenkins' house (where the defendant had never been before) and he asked Jenkins to call the sheriff and report that the Daughertys had been killed. The telephone at the Daugherty house had been disconnected at the outside terminal box. He and Jenkins then drove their separate cars to the scene. He told an officer there that when he discovered the tragedy he tried to use the phone but it was dead.

The defendant had been working for Ernest Hamilton. On Saturday March 4, 1972 he told Hamilton he needed some money to buy groceries and Hamilton gave him $40 as an advance on his wages. The defendant left his .38 revolver at Hamilton's house that day while they went to Maryville to buy electrical supplies.

About 9:00 a.m. on Sunday March 5, 1972 the defendant went to the home of Herman Lipps and gave his wife $275 in payment of a debt he owed Lipps, which Lipps had threatened to sue him for on the preceding Wednesday. The same Sunday morning between 7:00 and 8:00 o'clock the defendant bought $2.00 worth of gas at a filling station in Etowah and paid for it with a one hundred dollar bill. Between 8:00 and 8:30 the same morning the de-

fendant paid Bill Sissom $305 for two cows he had bought from him the preceding Friday. He sold two cows at the Cleveland Livestock Auction for $329 the same day he bought the two cows from Sissom. The defendant bought a truck from the Harvey Motor Company of Madisonville on February 29, 1972 and gave a worthless check for $800 in payment; after being contacted twice about the check, the defendant went to the Motor Company office on March 11th and paid his account with six one hundred dollar bills and ten twenties. On Friday March 3, 1972 the defendant bought some property from Boyd McKinney and Ralph Daugherty, which they owned together and paid them $500 and was supposed to make a $1,000 payment on March 8, 1972.

The defendant did not testify. He called his stepfather, Ernest Hamilton and Harold Duggan as character witnesses, all of whom testified he had the reputation in the community of being a peaceable man. Duggan also testified that two or three days before the killings the defendant talked to him about buying some property from his father-in-law and said he was planning on putting some cattle on the property; that when he asked the defendant where he got "that kind of money to do that with," the defendant replied "I made a cattle transaction a day or two ago," and showed him his billfold and claimed to have about $3,000 in it.

The defendant's wife testified that he arose early that fatal Sunday morning, as usual; that he awakened her about 9:30 and they sat around and drank coffee and she dressed herself and the baby and about 11:30 they left to go to her parents' house for Sunday dinner; and that when they arrived there the defendant took the baby and went on to the house while she was getting some toys and other things out of the car, and then he came running back with the baby and told her something was wrong and to get in the car; and that they then drove to Jim Jenkins' house. She said the defendant "has always been in

debt and there is always somebody needing money" and that he was in serious financial trouble at the time. She said she left the Jenkins' home long enough that morning to view the scene at her parents' home. She asked the defendant where his gun was but he did not tell her. She testified that prior to March 5th she had given her mother about $200 and had also given her father some money, which he kept under a brick in the hearth, to keep for her because "I was saving my money for the simple reason that Bill wrote checks and when there was a warrant out after him he would leave the State. I needed money to support myself and child." She said that shortly before March 5th he paid her father $500 on some land.

██ To warrant a criminal conviction upon circumstantial evidence alone, the law in this State is that the evidence must be not only consistent with the guilt of the accused but it must also be inconsistent with his innocence and must exclude every other reasonable theory or hypothesis except that of his guilt, and it must establish such a certainty of guilt of the accused as to convince the mind beyond a reasonable doubt that he committed the crime charged. Patterson v. State, 4 Tenn.Crim.App. 657, 475 S.W.2d 201 and cases therein cited.

██ The weight of circumstantial evidence is for the jury to determine. The inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury. Patterson v. State, supra.

██ In a case resting upon circumstantial evidence alone, it becomes necessary for this Court to determine, upon the facts and circumstances shown in the proof, whether or not the evidence measures up to the circumstantial evidence rule. Patterson v. State, supra.

██ We have carefully examined this record. Viewed in the light of settled le-

gal principles governing appellate review of the evidence when its sufficiency is challenged on appeal in criminal cases, Webster v. State, 1 Tenn.Crim.App. 1, 425 S.W.2d 799; McGill v. State, 4 Tenn. Crim.App. 710, 475 S.W.2d 223, the conclusion is inescapable that the evidence fully justified the verdicts of the jury. The defendant has failed to carry his burden of demonstrating in this Court that the evidence preponderates against those verdicts and in favor of his innocence. Upon this record the jury was fully warranted in finding, as they evidently did, that the defendant killed his father-in-law, mother-in-law and brother-in-law in the perpetration of "robbery, burglary, or larceny." T.C.A. § 39–2402.

■ In the total context of this record, there is no merit in the Assignment that the court erred in allowing the State to introduce evidence of a prior conviction of the defendant. This has reference to the testimony of Alex Crumley, an employee of the McMinn County Sheriff's office, who read, from what he said was the court file of a 1971 case involving the defendant, an order entered by the trial court on 13 August 1971. The order suspended the defendant's one-to-three-year penitentiary sentence and placed him on probation for three years upon certain specified conditions, one of which was that "The defendant shall reimburse to the prosecutor the sum of $1600 within six months." While we do not understand why a sheriff's employee was used to prove the former judgment of the McMinn County Criminal Court, the defense objection did not complain of that procedure but, rather, was directed to the proposition that the prior conviction was inadmissible because it was in no way related to the crimes charged in this case.

Obviously, the time limit of six months for repaying the $1600 expired the middle of February 1972. In a colloquy between the court and counsel about this matter apart from the jury, the District Attorney General stated the revocation notice was issued on March 21st and the court stated that the next term following thereafter was the April 1972 Term and that "every day that a payment such as this went beyond the deadline set by the Court, the six month deadline, would be that much closer to the penitentiary."

Moreover, in response to questions by defense counsel the defendant's wife related his continuing financial difficulties; when asked "What was Bill's normal routine when he got into trouble with a bad check or something of this type?" she replied, "Whenever there was a warrant out he always left." On cross-examination she testified, over defense objection overruled by the court, that she found out after this triple killing that he needed some money, and, when asked if he needed it to keep out of the penitentiary, she replied "Yes, and that has happened several times before."

All in all, we do not believe the defendant's right to a fair and impartial trial was prejudiced by the evidence concerning his conviction in August of 1971. Further, that evidence was introduced for the purpose of showing the defendant had a motive in undertaking to take a large sum of money from his father-in-law, including the $500 he had paid him on the land purchase. Evidence of a prior conviction is admissible to show the accused's motive for committing the crime charged. Webster v. State, supra; Snowball v. State, Tenn.Cr.App., 477 S.W.2d 240; Liakas v. State, 199 Tenn. 298, 286 S.W.2d 856; Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523; McGowen v. State, 221 Tenn. 442, 427 S.W.2d 555.

■ Also without substance is the fifth Assignment that the court erred in allowing a State's witness to testify to a statement against interest made by the defendant, because the statement had not been furnished to defense counsel in compliance

with an order of the court. This refers to the above-noted testimony of the coroner about what the defendant said at the scene. In the first place, no defense objection was interposed to that testimony of the coroner. Crawford v. State, 4 Tenn.Cr.App. 142, 469 S.W.2d 524; Bryant v. State, Tenn.Cr.App., 503 S.W.2d 955. Beyond that, however, the name of coroner Newman was endorsed on each of the indictments.

■ ´Equally baseless is the complaint about the argument of the prosecuting attorneys. There was no defense objection. That is essential. Rivera v. State, 1 Tenn.Cr.App. 395, 443 S.W.2d 675; Harris v. State, 3 Tenn.Cr.App. 64, 457 S.W.2d 370; Hunter v. State, 222 Tenn. 672, 440 S.W.2d 1.

■ Groundless also is the Assignment that the court erred in failing to give the jury the instruction specially requested by the defendant. The request related to circumstantial evidence. That subject was fully covered by the court in its charge. Freshwater v. State, 2 Tenn.Cr.App. 314, 453 S.W.2d 446; Dezarne v. State, 4 Tenn.Cr.App. 209, 470 S.W.2d 25.

■ Contrary to the defendant's insistence, we perceive no error in the action of the trial court in ordering the three sentences to run consecutively. Whether sentences should be served concurrently or consecutively is a matter addressed to the sound judicial discretion of the trial judge. Wooten v. State, Tenn.Cr.App., 477 S.W.2d 767; T.C.A. § 40–2711.

The defendant's remaining Assignments of Error have been considered carefully and we find them to be unmeritorious.

■ We note that in each of the three cases the trial judge pronounced judgment rendering the defendant infamous. Homicide is not an infamous crime. T.C.A. § 40–2712. The judgment of the trial court in each of the three cases is modified by vacating that portion thereof which erroneously adjudged the defendant infamous. Howard v. State, Tenn.Cr.App., 506 S.W.2d 951, and cases therein cited. As thus modified, the judgment in each of the three cases is affirmed.

GALBREATH and DWYER, JJ., concur.