**STATE of Tennessee, Appellee,**

v.

**Evelyn MAX, Appellant.**

Court of Criminal Appeals of Tennessee, at Jackson.

April 30, 1986.

Permission to Appeal Denied by Supreme Court July 28, 1986.

Michael W. Whitaker, Langdon S. Unger, Jr., Gordon, Forrester & Whitaker, Covington, for appellant.

W.J. Michael Cody, Atty. Gen., James W. Thompson, Asst. Atty. Gen., Nashville, Paul G. Summers, Dist. Atty. Gen., J. Kerry Blackwood, Asst. Dist. Atty. Gen., Somerville, Paul E. Dew, Asst. Dist. Atty. Gen., Ripley, for appellee.

## OPINION

SCOTT, Judge.

Indicted for murder in the first degree, the appellant was convicted of murder in the second degree and received a sentence of twenty years in the state penitentiary as a Range I, standard offender. On appeal she has presented six issues, one of which challenges the sufficiency of the convicting evidence. Specifically, she contends that the evidence of insanity at the time of the commission of the offense preponderates against the verdict and in her favor.

On the night of June 23, 1984, the appellant and her husband, James A. Max, went to the Little Hatchie Cafe, a beer joint, where they drank and danced. Customers at the tavern testified that they did not appear to be upset with each other, and, according to one witness, everything seemed "rosy" between them.

They left together in their truck, with Mr. Max driving. Morris Ray Jobe, who had talked with them earlier in the evening, happened to be leaving at the same time and also happened to be going in the same direction. Mr. Jobe was some distance behind them when he noticed that the truck's brake lights came on and the truck stopped in its lane of a four lane highway. He

stopped behind the truck and approached to see what was the matter. As he approached, he saw the appellant standing outside the passenger side of the truck with the door open. According to Mr. Jobe, the appellant said that Mr. Max just "took out the gun and started shooting hisself."

Mr. Jobe returned to the Little Hatchie Cafe where he told others to summon the sheriff and an ambulance. He then returned to the scene and found the appellant still standing beside the truck. Diane Greenhaw, who had been at the cafe, went to the scene. She reached through the open truck window and felt of the victim's neck to see if he was alive. At that time another man pulled her away. As he did, the truck door came open and the victim fell out onto the pavement. A .22 caliber pistol also fell from the truck. Since the tractor-trailer truck traffic was very heavy, the men at the scene dragged the victim behind his truck and picked up the gun so that neither would be run over.

The holster for the pistol was found on the floorboard next to the outside wall on the passenger side of the truck. The appellant told the investigating officers that she heard three pops and noticed that the victim had shot himself.

Dr. O'Brien C. Smith, a pathologist, performed the autopsy on Mr. Max. He found that he had one gunshot wound to the head, three to the chest and two to the abdomen. All of the bullets entered the body in a right to left pattern. The shot to the head and each of the three to the chest would be fatal. Thus, he classified the cause of death as multiple gunshot wounds. He noted that five of the six shots were fired within twenty-four inches of the body, several were fired from within six inches, but none were contact wounds. He also noted that there were numerous abrasions and bruises on the victim's right arm, indicating that there was a struggle before his death. Dr. Smith testified that based upon the number of shots fired into the body, the distances from which they were fired and the portions of the body into which they were fired, that it was his opinion that they could not have been self-inflicted.

The appellant presented the defense of insanity. Dr. Thomas Albert Davis, a psychiatrist practicing in Valdosta, Georgia, had previously treated her from November 1973 to February 1974. He examined her entire history of mental illness and testified by deposition as follows:

Q. Doctor, to a reasonable degree of medical certainty, however, can you state that they did not exist or could not be a reasonable possibility that Evelyn Max was mentally ill on June 24th, 1984 to such degree that she could not conform her conduct to the requirements of the law? What I am saying is, can you exclude that as a reasonable possibility?

A. Well no, Evelyn is mentally ill. She has been for a long, long time and she will be for a long, long time. The degree of her impairment in June of 19—

Q. '84.

A. '84, I simply cannot ascertain at this point in time.

In addition she presented the testimony of a sister who recounted the appellant's troubled life, which included a history of prior failed marriages and mental illnesses. A friend who visited her in jail following her arrest recounted her memory lapses during conversations and her assertion that God had personally visited her in her cell.

In rebuttal, the state called Dr. Glenn Watson, a clinical psychologist, and Dr. John Filley, a psychiatrist. Both agreed that the appellant was not insane at the time of the commission of the crime. Dr. Watson testified:

Q. Let me ask you this question, Doctor. On—did you form an opinion as to her mental status on June 24th, early hours in the morning—the early morning hours of June 24th, 1984?

A. Yes.

Q. At that time, Doctor, do you have an opinion about whether she was suffering from a mental illness or defect?

A. That she is suffering, I wouldn't say suffering—that she is exhibiting a mental—that she was not really exhibiting a mental disorder because borderline intellectual functioning is still considered normal so that—and the adjustment reaction came on after the arrest, so that at the time of the alleged offense, she was exhibiting borderline intellectual functioning, but that did not impair her capacity to appreciate the wrongfulness of the alleged offense or impair her capacity to conform her conduct to the requirements of the law.

Q. And that is a definition of insanity under the law?

A. Under the Graham Rule, yes.

Q. Therefore, you are of the opinion that she was not insane at the time of the commission of the offense?

A. That is correct.

Dr. Filley concurred, testifying:

Q. Doctor, also were you able to come to an opinion with regard to her sanity at the time of the commission of this offense?

A. We formed an opinion, yes.

Q. And would you tell us what that opinion was?

A. We did not feel that there was any mental disorder of a sort that supported the idea of an insanity defense, at the time of the crime.

Q. Are you familiar with the Graham definition of insanity in the State of Tennessee?

A. Yes, I am.

Q. Did she, in your opinion, fit that definition?

A. No, she did not.

■ In order for a person to avoid responsibility for criminal conduct based upon the defense of insanity, she must lack substantial capacity either to appreciate the wrongfulness of her conduct or to conform her behavior to the requirements of the law. *Graham v. State*, 547 S.W.2d 531, 543 (Tenn.1977). If the evidence adduced by the defendant or the state raises a reasonable doubt as to the defendant's sanity, the burden is upon the state to then prove the defendant's sanity to the satisfaction of the jury and beyond a reasonable doubt. *Id.* at 544. That is precisely what the state did in this case.

■ A jury verdict of guilty, approved by the trial judge, accredits the testimony of the state's witnesses and resolves all conflicts in favor of the theory of the state. *State v. Hatchett*, 560 S.W.2d 627, 630 (Tenn.1978). On appeal the state is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences which may be drawn therefrom. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn.1978).

■ There was ample, indeed overwhelming, evidence from which any rational trier of fact could conclude that at the time that she killed her husband the appellant was sane beyond a reasonable doubt. Rule 13(e), T.R.A.P., *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 2786–2792, 61 L.Ed.2d 560 (1979). This issue has no merit.

In another issue the appellant contends that the trial judge erred when he excused one of the jurors after the jury panel had been sworn, but before opening statements were given or any evidence was heard. The appellant sought a mistrial, claiming that she lost her opportunity to view the array for balance on the jury when the alternate replaced the discharged juror.

The members of the venire were asked if there were any members of their families who had been hospitalized because of mental illness, as well as other questions concerning the insanity defense. Their replies were apparently negative. The jury panel was selected and sworn. An alternate juror was then selected. The prosecutor, believing that a juror had a son under the care of a psychiatrist, moved to disqualify

her. The trial judge granted the motion, excused the juror and over objection, seated the alternate in her place. In response to the judge's question regarding the nature of the mental illness of her son, the prosecutor stated:

As best as I can recall it was a history of being a peeping tom and when he has been indicted up here he has always been sent, first of all to Tri-County and then I think he has been sent to Western State for the thirty-day evaluation and I believe at one time we committed him for being incompetent to stand trial.

■ The appellant claims that the state waived any objection to the juror sitting when it failed to exercise a peremptory challenge prior to the jury being sworn. Rule 24(e), T.R.Cr.P., provides:

Alternate jurors, in the order in which they are selected, shall replace jurors who, *prior to the time the jury retires to consider its verdict,* become or are found to be unable or disqualified to perform their duties. (emphasis added)

This rule clearly allows a good faith challenge for cause at any time prior to the jury retiring to consider its verdict. Long before this rule was promulgated the statutes and case law allowed the trial judge to replace a sick juror and begin the trial anew with the original jurors and the newly seated juror composing the jury panel. Alternatively, the judge could discharge the entire panel and continue the case for trial before another panel.

■ The discharge of the juror does not break up the entire panel. The other jurors remain a part of the jury panel and are not subject again to challenge nor are they to be resworn after a replacement is seated. *Deberry v. State,* 99 Tenn. 207, 42 S.W. 31, 33 (1897).

The provision for alternate jurors was first enacted in 1939. Public Acts of 1939, ch. 27, § 1. With the advent of Rule 24(e) of the Tennessee Rules of Criminal Procedure, the statutory provision was repealed. Public Acts of 1979, ch. 399, § 1. Alternate jurors eliminate the necessity for beginning the trial anew, since the alternate has the benefit of hearing all the testimony heard by the regular panel members.

The trial judge failed to question the juror about her possible bias prior to replacing her, but relied upon the assertions of the prosecutor. As a result, the appellant complains that the dismissal of the juror was arbitrary. Relying upon *Hines v. State,* 27 Tenn. (8 Hump.) 597, 599 (1848), she contends that she is entitled to an acquittal. As evidence that the replacement of the regular juror was arbitrary, counsel states in his brief that the trial judge called the excused juror into his chambers to explain why he had removed her from the jury panel and then learned that she was not the mother of the peeping tom.

■ Statements in briefs as to what occurred in the trial court cannot be considered unless they are supported by the record. Appellate courts take cognizance only of events that are recorded in the record. *Murray Ohio Manufacturing Co. v. Vines,* 498 S.W.2d 897, 900 (Tenn.1973).

*Hines v. State* does not stand for the proposition that wrongful discharge of a juror requires an acquittal, a harsh remedy indeed. That case involved the seating of a juror who was a minor. That fact was discovered before he was sworn and the juror was excused. The Supreme Court held the defendant was not entitled to be discharged because the juror was replaced. In dictum, the Court continued:

We do not doubt but that if the court were arbitrarily to discharge a juror, after he had been duly elected, without any sufficient reason for so doing, it would be error, and would entitle the defendant to a *venire de novo. Hines v. State,* supra.

Thus, even if the trial judge arbitrarily discharged a juror, the remedy would not be acquittal, but rather a new trial.

■ The trial court erred by failing to interview the juror before discharging her. However, this does not mean that the trial judge did not have a good faith belief that

she would have difficulty being fair. The record indicates that, relying upon the prosecutor's unequivocal assertion that she was the peeping tom's mother, the trial judge honestly believed that she should be discharged.

The burden is on the defendant to demonstrate how she was prejudiced by the seating of the alternate juror. *Dorsey v. State,* 568 S.W.2d 639, 645 (Tenn.Cr.App. 1978). In this case the alternate juror was not challenged during voir dire. The trial judge offered the defense counsel an opportunity to question the alternate before the juror was excused, but counsel declined to do so.

The appellant also argues that the impaneling of the alternate juror constituted double jeopardy. Jeopardy attaches in a jury trial when the defendant is put to trial before a court of competent jurisdiction upon a sufficient indictment and the jury is impaneled and sworn. *State v. Todd,* 654 S.W.2d 379, 382 (Tenn.1983). The discharge of a juror in a criminal case during the progress of a trial, after which another (or alternate) juror is impaneled will not authorize a plea of double jeopardy. *DeBerry v. State,* supra, *Collins v. State,* 220 Tenn. 23, 413 S.W.2d 683, 687 (1967). This issue has no merit.

In another issue the appellant contends that the trial judge erred by allowing a T.B.I. agent to testify as an expert concerning highly scientific and technical matters when he had no education or training in the field.

Tony Bowers, an agent of the Tennessee Bureau of Investigation, testified that .22 caliber Remington ammunition leaves no ammonium and barium residue. He testified that this was the type ammunition used in this case, and that he ran gunshot residue tests on both the appellant and the victim. However, he was not asked to share the results of his tests with the jury.

Mr. Bowers testified that he had received extensive training in firearms and related matters at the F.B.I. National Academy at Quantico, Virginia. In addition, he testi-fied that he was very familiar with the gunshot residue test and had personally administered the test to suspects on several occasions.

The issue of the competency of an expert witness is within the discretion of the trial court and the decision to allow expert testimony will not be reversed on appeal unless there is a showing of a clear abuse of discretion. *State v. Fears,* 659 S.W.2d 370, 377 (Tenn.Cr.App.1983). One who has specialized knowledge, skill or experience can testify as an expert. *Casone v. State,* 193 Tenn. 303, 246 S.W.2d 22, 26 (1952).

Mr. Bowers demonstrated that he has specialized knowledge, skill and experience concerning firearms. There was no abuse of discretion in allowing him to testify. The appellant's complaint actually addresses the weight to be given his testimony rather than its admissibility. Furthermore, his testimony added nothing to the state's case, since the results of the tests were never provided to the jury. This issue has no merit.

In the next issue the appellant contends that the trial judge erred by refusing to give his requested charge on malicious shooting. The appellant contends that malicious shooting proscribed in TCA § 39-2-112 is implicitly embraced within an indictment for murder because both require a malicious intent.

As early as 1865 our Supreme Court held that there can be no conviction for malicious shooting under an indictment for assault with intent to commit murder in the first degree because the offenses are "separate, distinct and independent, and in no sense are they different grades of the same offense." *McCroskey v. State,* 42 Tenn. (2 Cold.) 178, 179–180 (1865). Since malicious shooting is not embraced in an indictment for assault with intent to commit murder in the first degree, it is not embraced in an indictment for first degree murder. This is true since the difference between assault with intent to commit murder in the first degree and murder in the first degree is that death ensued in the

latter case, but did not in the former. *Dains v. State*, 21 Tenn. (2 Humph.) 438, 440 (1841). This issue has no merit.

In the next issue the appellant contends that the trial judge erred by charging the jury concerning the three issues germane to the insanity defense in the conjunctive and disjunctive forms.

First, the trial judge instructed the jury as follows:

> As a part of the plea of not guilty, the defendant relies upon the defense of insanity. You are not to consider this defense unless you have found that the State has proven beyond a reasonable doubt each essential element of the crime charged.
>
> Shortly, ladies and gentlemen, I am going to give you this charge to take with you. I think once you have gone through the elements of the crime, then you need to especially read closely that portion of that charge that deals with the question of sanity.
>
> You are not to consider this defense unless you have found that the State has proved beyond a reasonable doubt each essential element of the crime charged. A person is not responsible for criminal conduct if at the time of such conduct, as a result of mental disease or defect, she lacks substantial capacity either to appreciate the wrongfulness of her conduct or to conform her conduct to the requirements of the law. A mental disease or defect is defined as any abnormal condition of a mind which substantially affects mental or emotional processes and impairs the behavior controls. The behavior controls refer to the processes and capacity of a person to regulate and control his or her conduct. The term "mental disease or defect" does not include any abnormality manifested only by repeated criminal or otherwise anti-social conduct.
>
> The questions for you to consider are as follows: Was the defendant suffering from a mental illness at the time of the commission of the crime. (2) Was that illness such as to prevent her knowing the wrongfulness of her acts. (3) Was the mental illness such as to render her substantially incapable of conforming her conduct to the requirements of the law she is charged with violating.

As the appellant concedes, this is a correct statement of the law. However, she contends that the trial judge should have clearly pointed out that an affirmative finding as to the first question, plus an affirmative finding as to either the second or third question would result in an acquittal. *Graham v. State*, supra, at 543.

The appellant argues that the instruction clouded the proper standard to be applied in this case, leaving the impression that the jury must find in the negative on *both* the second and third questions in order to acquit. She requested that the trial judge clarify any ambiguity, but her request was denied. Thus, the appellant claims that this instruction minimized the state's burden of proof.

■ If the instruction given is a correct statement of the law and fully and fairly covers the applicable law, it is not error to refuse to give a specially requested charge, *Edwards v. State*, 540 S.W.2d 641, 649 (Tenn.1976).

■ The instruction given, taken directly from T.P.I.—Crim. § 36.06, did not mislead the jury. The second passage from the charge neither stated nor suggested that both elements are necessary for a finding of insanity. In addition, the trial court later instructed the jury from T.P.I.—Crim. § 36.06 as follows:

> If a reasonable doubt has been raised as to the defendant's sanity, then for him or her to be legally responsible for his or her conduct, the State must have proven beyond a reasonable doubt *either* that she was not suffering from a mental disease or defect or else that she nevertheless had substantial capacity *both* to conform her conduct to the requirements of the law and to appreciate the wrongfulness of her conduct.
>
> If the State has not established these things beyond a reasonable doubt, or if

you have a reasonable doubt as to whether at the time of the commission of the crime the defendant as a result of mental disease or defect lacks (sic) substantial capacity *either* to appreciate the wrongfulness of her conduct *or* to conform her conduct to the requirements of the law, then you must acquit her. (emphasis added)

The law was correctly charged and it was not error to deny the appellant's request for an additional charge. This issue has no merit.

Finally, the appellant contends that the trial judge erred in sentencing her because he did not find her to be an especially mitigated offender. She argues that her lengthy history of mental illness, her low intelligence quotient and her lack of a prior record should have earned her especially mitigated offender status.

When sentencing issues are raised on appeal, this Court conducts a *de novo* review on the record to determine the propriety of the sentence, as required by § 31 of the Tennessee Comprehensive Correction Improvement Act of 1985, Chap. 5, Public Acts of 1985, First Extraordinary Session, to be codified at TCA § 40–35–402(d). In so doing, we have indulged in no presumption that the sentencing decisions of the trial judge were proper.

■ Having reviewed the record in that manner, we find that there was one extreme mitigating factor contemplated by TCA § 40–35–108(b)(3). The extreme mitigating factor is the appellant's history of mental illness dating back to 1966, when she voluntarily entered Central State Hospital in Milledgeville, Georgia. At that time she was diagnosed as having a psychotic depressive reaction. Over the years she has had a number of readmissions to various mental hospitals in North Carolina, Texas, and Tennessee. While not a defense to the crime, her mental condition certainly "significantly reduced her culpability for the offense." TCA § 40–35–110(9).

On the enhancement side of the ledger, her action caused particularly great personal injury to the victim. TCA § 40–35–111(6). Of course, that is true in every murder case. In addition, she employed a firearm in the commission of the offense. TCA § 40–35–111(9).

Thus, it appears that present in this case were "a minimum of enhancing factors" and one "extreme mitigating" factor. TCA § 40–35–108(b)(3). The judgment is modified to designate the appellant an especially mitigated offender.

■ The record also reveals that the appellant maliciously murdered her husband. No motive is shown in the record. She shot him six times at close range inside the cab of their pickup truck. At all times she has continued to maintain that he committed suicide. Therefore, the sentence of twenty years was proper.

Finding no merit to any of the issues presented except the sentencing designation, the judgment is affirmed, as herein modified.

DAUGHTREY and CORNELIUS, JJ., concur.