IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT KNOXVILLE

MAY 1998 SESSION



**FILED**

**March 31, 1999**

**Cecil Crowson, Jr.**
**Appellate Court Clerk**

| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | |
| | ) | |
| Appellee, | ) | No. 03C01-9707-CR-00262 |
| | ) | |
| | ) | Knox County |
| v. | ) | |
| | ) | Honorable Mary Beth Leibowitz, Judge |
| | ) | |
| WILLIAM JASON McMAHAN, | ) | (Aggravated Robbery, Criminally Negligent |
| | ) | Homicide, and Theft) |
| Appellant. | ) | |

For the Appellant:

J. Jeffrey Whitt
706 Walnut Street
Suite 902
Knoxville, TN 37902

For the Appellee:

John Knox Walkup
Attorney General of Tennessee
        and
Ellen H. Pollack
Assistant Attorney General of Tennessee
425 Fifth Avenue North
Nashville, TN 37243-0493

Randall E. Nichols
District Attorney General
        and
Fred Bright
Assistant District Attorney General
City-County Building
Knoxville, TN 37902

OPINION FILED:_____

JUDGMENTS OF CONVICTION FOR AGGRAVATED ROBBERY AND CRIMINALLY
NEGLIGENT HOMICIDE AFFIRMED; JUDGMENT OF CONVICTION FOR THEFT
VACATED AND CONVICTION MERGED INTO THE AGGRAVATED ROBBERY
JUDGMENT OF CONVICTION

Joseph M. Tipton
Judge

**O P I N I O N**

          The defendant, William Jason McMahan, appeals as of right following his 1997 jury convictions in the Knox County Criminal Court for aggravated robbery, a Class B felony, criminally negligent homicide, a Class E felony, and theft of more than one thousand dollars but less than ten thousand dollars, a Class D felony. He received consecutive sentences of twelve years, two years and four years, respectively, to be served in the Department of Correction as a Range I, standard offender. The defendant presents the following issues for our review:

> (1) whether the evidence is sufficient to support the defendant's aggravated robbery conviction;
>
> (2) whether the defendant can be found guilty of both aggravated robbery and theft;
>
> (3) whether the trial court erred by refusing to allow the jury to rehear testimony upon request once deliberations had begun; and
>
> (4) whether the trial court erred in sentencing the defendant with regard to the weight given certain enhancement factors and to the imposition of consecutive sentencing.

We conclude (1) that the evidence is sufficient to support the defendant's aggravated robbery conviction, (2) that the convictions for both aggravated robbery and theft violate double jeopardy principles, (3) that although the trial court should have allowed the jury to rehear the testimony, the error was harmless and (4) that the defendant was properly sentenced.

          The defendant was charged with felony murder for the killing of the victim, Robert Lambdin, in perpetration of robbery and theft. The defendant also was charged with one count of especially aggravated robbery and one count of theft of property valued at more than ten thousand dollars but less than sixty thousand dollars.

2

At trial, James "J.L." Keaton testified that on the afternoon of September 15, 1995, he went to The Finish Line bar after work. He said that while there, he ran into Danny Carroll and another person, whom he identified as the defendant. He stated that he and Carroll went behind the bar to drink and smoke cocaine, but the defendant remained in the bar. He said that after a couple of hours, he drove the three of them to an apartment in South Knoxville where they bought some cocaine. He testified that all three of them used the cocaine initially, but then the defendant ran out of money. He said that he and Carroll continued to use cocaine but did not give any to the defendant.

Keaton testified that the defendant said he wanted to be driven to his house to get some money. He said that he was driving, Carroll was in the passenger seat and the defendant was in the backseat. He said that the defendant directed him to a subdivision, which he later learned was Murphy Hills. He stated that once there, they had to drive around before the defendant could identify the right house. He said that when they left the defendant at the house, the defendant did not ask them to wait for him.

Keaton testified that he and Carroll then drove to his mother's trailer, which was about two miles from where they left the defendant. He stated that he and Carroll continued to smoke cocaine in the trailer. He said that about thirty minutes later, the defendant came to his door. He said that the defendant had been to the trailer once before to help Carroll repair his car while he was at work. He said that when he answered the door, the defendant was breathing heavily and sweating like he had been running. He stated that Carroll went out on the porch and spoke with the defendant.

Keaton testified that the defendant left and Carroll came inside and said that the defendant had to go drop off his car. He said that he and Carroll stayed at the trailer and finished using the cocaine, then they drove up the street and picked up the

defendant who was walking and carrying a lunch cooler that he did not have earlier. He said he then drove the three of them back to the apartment in South Knoxville, where they continued to use cocaine, drink and take Valium throughout the night. He stated that he did not remember what happened to the defendant after this but that he thought that he and Carroll left the defendant at the apartment and that he took Carroll home. He said that he did not know whether they used Carroll's or the defendant's money for the final cocaine purchase but that he had no money at that point.

On cross-examination, Keaton testified that did not know the defendant before running into him at the bar that afternoon. He said the purpose of taking the defendant to his house was for the defendant to get money to get high with them but that he did not remember if the defendant said that he was going to get the money or borrow it. He stated that when the defendant came to the trailer door, he did not notice any blood on the defendant's clothes, and the defendant did not come into his trailer to change clothes.

Danny Carroll testified that on September 15, 1995, he and the defendant worked together building homes. He said that he and the defendant left work together and went to The Finish Line bar around 5:00 or 6:00 p.m. He stated that he saw J.L. Keaton at the bar, and he introduced the defendant to Keaton. He said while at the bar, the three of them were drinking and using cocaine. He stated that Keaton drove the three of them to South Knoxville, where they bought more cocaine. Carroll said that he thought they all got some cocaine but that he did not remember who paid for it. He stated that they used more cocaine while in South Knoxville, then they returned to The Finish Line about 7:00 or 8:00 p.m.

Carroll testified that the three of them left the bar after a couple of hours. He stated that the defendant said he wanted to borrow some money from Blue, who

4

owed the defendant money because the defendant had repaired his truck. Carroll said he knew Robert Lambdin, who ran Greenway Sports, by the nickname Blue. He testified that Keaton drove, he rode in the passenger's seat and the defendant rode in the backseat. He said that he did not know where Blue lived, but they took the defendant to Murphy Hills. He said the defendant did not know which house was Blue's, and they had to drive around the block before dropping off the defendant. He said they did not wait on the defendant because he told them that Blue would give him a ride home.

Carroll testified that he and Keaton went to Keaton's trailer, which was about one to one and one-half miles away, and they used cocaine and drank. He said one to one and one-half hours later, the defendant came to the door. He said that the defendant had been to Keaton's trailer with him before to work on Keaton's car while he was not there. Carroll said that he and the defendant talked outside and that the defendant looked like he had been in a fight. He stated that the defendant was upset and crying. He said the defendant told him that he and Blue got into a fight, Blue hit his head on a table, and it might have knocked out Blue. He stated that the defendant told him that he did not know whether the blow had killed Blue. He said Keaton gave the defendant another shirt to wear because the defendant's shirt was ripped and bloody. He stated that the defendant changed clothes in Keaton's bathroom.

Carroll testified that the defendant said he was in Blue's car and needed to drop off the car. He stated that the defendant said he was going to park the car up the street, and he wanted them to meet him there. He said that he and Keaton left a few minutes after the defendant and picked him up about one mile down the road. He said that when they picked him up, the defendant had a small Igloo cooler with him. He stated that he had seen the cooler before at the pool hall, and Blue used it to hold his marijuana. He said the cooler contained two bags of marijuana and some snacks. He

5

stated that he saw the defendant counting some money, and he overheard the defendant say it was over two thousand dollars. He said that he did not think the defendant had the money before they dropped him off at Blue's house. He stated that the defendant kept the marijuana but threw the cooler out of the car.

Carroll testified that the three of them then drove back to South Knoxville, and the defendant gave him two or three hundred dollars to buy cocaine. He stated that he did not know exactly how much cocaine he purchased that night but that he made at least three purchases with money from the defendant. He said that the defendant left while he was making the final purchase and that he rode home with Keaton at 2:00 or 3:00 a.m. He stated that the next evening while watching the news, he found out that Blue had been killed.

On cross-examination, Carroll testified that the defendant did not have a gun or a knife with him when they dropped him off at Blue's house. He stated that the defendant had asked him to go inside Blue's house. He said the defendant also asked them to wait on him, but Keaton wanted to leave. He admitted that they had counted the defendant's money at Keaton's trailer.

Jim Kesterson testified that he is a highway patrolman with the crime scene unit for the Knox County Sheriff's Department. He stated that on September 16, 1995, he went to the crime scene at the victim's house. He said the victim was lying on the floor near the front entrance, and a recliner was overturned on top of him covering his face. He said the victim was clutching part of a plastic bag, and another part of the bag was in front of the fireplace. He stated that a black nylon bag that held a .38 caliber revolver was on the end table. He said an open bag was on the couch, and it contained money and an automatic pistol. He said that the victim's wallet was in his rear pocket and contained money. He stated that the fingerprints on a drinking glass in

6

the room matched those of the defendant. He testified that the telephone receiver appeared to have been ripped from its base. He stated that blood spatters were found in various places in the room, along with bloodstains on the recliner and on the rug underneath the victim's head.

On cross-examination, Officer Kesterson testified that he could not say whether the blood in the room belonged to the victim or to the defendant. He stated that there was no blood on the telephone. He said that he found clear plastic baggies and a football betting sheet near the victim. He stated that he did not collect any marijuana as a result of his investigation, but he knew that Detective Johnson collected some.

Detective Darrell Johnson testified that he is a detective for the Knox County Sheriff's Department and that he went to the victim's house on September 16, 1995. He stated that the victim appeared to have been dead for several hours and had bruises and cuts. He stated that the victim's 1988 red Ford Festiva was recovered. He said that on September 29, 1995, he interviewed the defendant, and the defendant gave him the name of an individual that might have information about the crime. Detective Johnson stated that the next time he spoke with the defendant was on March 29, 1996, at the Sheriff's Department and that the defendant was a suspect at that time. He said that the defendant executed a written waiver and then gave a taped statement.

The defendant's taped statement was played for the jury. In this statement, the defendant said that he and Danny Carroll went to The Finish Line after work. The defendant said he and Carroll took a cab from the bar to South Knoxville, where they used cocaine before returning to the bar. The defendant said that at the bar, he and Carroll ran into Carroll's friend, J.L. Keaton, and the three of them left the bar in Keaton's car. The defendant stated that Carroll asked him where he could get

7

more money for cocaine.  He said that he had them take him to Blue's house in order for him to borrow one hundred dollars.  He stated that he already owed Blue two or three hundred dollars.

The defendant's statement revealed that they arrived at Blue's house just before nightfall.  He said that he asked Carroll to go inside with him but Carroll declined.  The defendant said that Blue let him in the house.  He said that Blue showed him some marijuana in the kitchen, and Blue said that he intended to give the defendant an ounce of marijuana for repairing his truck.  He said that Blue refused his request to borrow money because he owed Blue money, and Blue said if he did not pay him, Blue could have "something done."

In his statement, the defendant said that he went to make a telephone call, and he felt Blue push or hit him in the back.  He said that he turned and hit Blue once on his head with the telephone.  He said that he and Blue began to fight and that when they fell to the floor, he got on top of Blue and hit him with his fist until Blue did not move.  He said that once Blue stopped moving, he tried to shake him, but Blue would not wake up.  He said he got up and wiped the blood from his hands onto the wall.  He said that he tried to get Blue to talk and shook him again.  He said he sat in the house for a period of time, then he pushed a chair on top of Blue.

In his statement, the defendant said that he realized that Carroll and Keaton had not waited on him, so he checked Blue's pockets for keys.  He said that he took keys and a bag of marijuana from Blue's pockets, and he took an envelope containing twenty-five hundred dollars from the table.  He said that he left in Blue's car, a red Ford Festiva.  He said he drove to Keaton's trailer where he told Carroll that he thought he had killed Blue.  He stated that his nose was bleeding, and he changed into Keaton's clothes because his clothes had blood on them.  He said that Carroll got rid of

8

his clothes and told him to move the victim's car. He said he drove the car to a certain spot, and Keaton and Carroll picked him up. He said they all left Keaton's trailer at the same time. He said that when he got in Keaton's car, he had the victim's cooler with him. He said that he removed some marijuana and threw the cooler out the car window.

The defendant's statement revealed that he spent the entire twenty-five hundred dollars on cocaine that night. The defendant stated that after purchasing and using cocaine in South Knoxville, he left Carroll and Keaton and went with Robbie Gibson to buy more cocaine with the last one hundred dollars, but he was cheated. He said that he did not mean to kill the victim and that he did not go to the victim's house intending to rob him. He said that he did not come forward earlier because he was scared.

On cross-examination, Detective Johnson testified that no tests were performed on the blood at the crime scene. He stated that money was found in the victim's wallet and in the money bag and that a ring was found in the bathroom. He said that he later recovered marijuana and money that had been in the victim's house but was not discovered when the police processed the crime scene. The detective said that the defendant was upset and crying during his statement and during the preceding interview.

Dr. Sandra K. Elkins testified that she is the Knox County Medical Examiner and that she performed an autopsy on the victim. She said that the victim died from multiple, blunt force injuries sustained during a beating. She testified that blows to the head had resulted in brain injuries and caused the victim's brain to bleed. She said that the victim had two broken cervical vertebrae in his lower neck. She stated that blunt force injuries to the chest resulted in nine broken ribs. She testified

that ten moderate to severe blows with a telephone receiver, fists or feet could have caused these injuries. She said that death could have resulted from either the head or the chest injuries and that the victim could have survived for one and one-half hours after sustaining these injuries.

Dr. Elkins testified that the victim was sixty-three years old, five-feet-eight-inches tall, weighed one-hundred-sixty pounds, and had emphysema. She stated that the victim had defensive wounds on the back of his lower right arm but no offensive wounds on his hands or knuckles.

On cross-examination, Dr. Elkins testified that death could have occurred within minutes but not instantaneously. She said that the injuries had no distinct patterns and could have occurred from falling on a table or against a wall. She stated that the victim's spinal cord was not severed, and she believed that the broken vertebrae were due to violent twisting or jerking of the neck. She stated that bones break more easily as people age and that cardiopulmonary resuscitation (C.P.R.) often causes broken ribs on sixty-year-old individuals.

The jury convicted the defendant of the lesser included offenses of criminally negligent homicide, aggravated robbery and theft of more than one thousand dollars but less than ten thousand dollars.

## I. SUFFICIENCY OF THE EVIDENCE

The defendant contends that the evidence is not sufficient to support his aggravated robbery conviction because he did not form the intent to take the victim's money until after the fight had concluded. The defendant states that the proof shows that he went to the victim's house to borrow money and was refused. The defendant claims he then attempted to make a phone call. The defendant says at that point, a

10

fight took place which rendered the victim motionless. The defendant argues that it was not until after the fight, as he was preparing to leave the house, that he decided to take the money. The defendant contends that because the proof does not show that he intended to take the money while the fight was in progress, he merely committed theft and not aggravated robbery. The defendant argues that the evidence showing that he asked Carroll to go into the victim's house with him, that he took no weapons with him, and that money, jewelry and other valuables were left in the victim's home further supports his contentions. The state argues that the evidence is sufficient.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). This means that we may not reweigh the evidence, but must presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). This standard applies to both direct and circumstantial evidence. State v. Thomas, 755 S.W.2d 838, 842 (Tenn. Crim. App. 1988); State v. Lequire, 634 S.W.2d 608, 614 (Tenn. Crim. App. 1981).

Circumstantial evidence may be used exclusively or in combination with direct evidence to establish guilt for a criminal act. See State v. Smith, 868 S.W.2d 561, 569 (Tenn. 1993). The one element present in almost all criminal offenses which is most often proven by circumstantial evidence is that relating to the culpable mental state. See Hall v. State, 490 S.W.2d 495, 496 (Tenn. 1973). Other than an accused stating what his or her purpose, intent, or thinking was at the relevant times, the trier of fact is left to determine the mental state by making inferences drawn from the

11

surrounding circumstances it finds to exist.  <u>See</u>, <u>e.g.</u>, <u>Poag v. State</u>, 567 S.W.2d 775, 778 (Tenn. Crim. App. 1978).  Furthermore, the jury is not obligated to accept the defendant's explanation of events.  The weight to be given circumstantial evidence is for the jury to determine.  <u>See</u> <u>Williams v. State</u>, 520 S.W.2d 371, 374 (Tenn. Crim. App. 1977).

Aggravated robbery is "the intentional or knowing theft of property from the person of another by violence or putting the person in fear" when accomplished with a deadly weapon or when the victim suffers serious bodily injury.  T.C.A. § 39-13-402, 403.  A deadly weapon is defined as "[a]nything that in the manner of its use or intended use is capable of causing death or serious bodily injury[.]"  T.C.A. § 39-11-106(a)(5)(B).

Taking the evidence in the light most favorable to the state, the defendant went to the victim's house because he needed money to buy more cocaine.  The victim refused to lend him money.  The defendant admitted that he hit the victim on the head with the telephone.  He also admitted hitting the victim numerous times on the head and chest with his fist until the victim became motionless.  The autopsy results revealed no offensive wounds on the victim's hands or knuckles but did show defensive wounds. The victim died from the injuries he sustained in this beating.  The defendant took an envelope containing twenty-five hundred dollars from a table near the victim's body. The defendant preceded to use all of the money he took from the victim to purchase cocaine that same night.  The jury could rationally conclude beyond a reasonable doubt that the victim did not participate in the "fight," but, instead, the defendant attacked the victim when the victim refused to lend him money in order to gain the money by force. The evidence is sufficient to support the aggravated robbery conviction.

12

## II. INCIDENTAL CONVICTION/ DOUBLE JEOPARDY

The defendant contends that because his theft conviction was factually similar and involved the same property as his aggravated robbery conviction, the conviction for theft is essentially incidental to the aggravated robbery conviction under State v. Anthony, 817 S.W.2d 299 (Tenn. 1991). The state argues that theft and aggravated robbery are two distinct offenses, with robbery involving a person and theft involving property only. The state contends that the defendant beat the victim in order to take his money, but only after the beating concluded did the defendant decide to take the victim's car.

In Anthony, our supreme court held that convictions for both kidnapping and robbery violated the defendant's due process rights when the detention resulting in the kidnapping conviction was essentially incidental to the commission of the accompanying felony. Id. at 306. However, when addressing whether convictions for aggravated assault, attempted voluntary manslaughter and a weapons offense could properly arise out of a single criminal act, the supreme court has preferred to address the question under principles of double jeopardy rather than conducting a due process analysis under Anthony. State v. Denton, 938 S.W.2d 373, 378 (Tenn. 1996). Unlike the kidnapping and robbery statutes discussed in Anthony, which each required proof of an element that the other did not, the aggravated robbery statute itself requires proof of a theft. See T.C.A. §§ 39-13-402. We believe that a double jeopardy analysis under Denton best reflects whether the defendant's constitutional rights were violated.

Both the United States and Tennessee Constitutions protect against twice being put in jeopardy for the same offense. U.S. Const. amend. V; Tenn. Const. art. I, § 10. The double jeopardy clause contains three protections: "It protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple

13

punishments for the same offense." North Carolina v. Pearce, 395 U.S. 711, 717, 89 S. Ct. 2072, 2076 (1969); Denton, 938 S.W.2d at 378.

In multiple punishment cases, such as this one, the focus is on legislative intent with the presumption being that the legislature typically does not mean for the same offense to be punished under two separate statutes. Id. at 379. In Tennessee, double jeopardy analysis requires four steps: (1) an analysis of the two statutes in question, (2) an analysis of the evidence needed to prove the two offenses, (3) a consideration of the number of victims and discrete acts, and (4) a comparison of the purposes behind the two statutes. Id. at 379-81. These steps are weighed as they relate to each other with none being determinative. Id. at 381.

The analysis of the two statutory provisions is directed by the test articulated in Blockburger v. United States:

> [W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one is whether each provision requires proof of an additional fact that the other does not.

284 U.S. 299, 304, 52 S. Ct. 180, 182 (1932). As noted above, theft does not require proof of an additional fact that aggravated robbery does not require. Thus, this step reflects that the legislature did not intend for a defendant to be convicted of both aggravated robbery and theft for the same set of facts.

Our supreme court in Duchac v. State examined the evidence required by the two statutory provisions to determine whether multiple punishments could stand:

> "One test of identity of offenses is whether the same evidence is required to prove them. If the same evidence is not required, then the fact that both charges relate to, and grow out of, one transaction, does not make a single offense where two are defined by statutes. . . . [T]here is no identity of offenses if on the trial of one offense proof of some fact is required that is not necessary to be proved in the trial of the

14

other, although some of the same acts may necessarily be proved in the trial of each."

505 S.W.2d 237, 239 (Tenn. 1973) (quoting Am. Jur. 2d Criminal Law, § 82) (noting that this determination turns upon the facts of each case).  In the present case, the evidence supporting the aggravated robbery was that after the victim refused to loan the defendant money, the defendant beat the victim until he was motionless and then took twenty-five hundred dollars from a table in the victim's home.  Although the defendant insisted that he was only participating in a fight initiated by the victim, the jury could reasonably infer from the absence of offensive wounds on the victim and the defendant's need for money to buy cocaine, that the defendant intended to rob the victim while he was inflicting the beating.  The victim suffered serious bodily injury in that he died as a result of the beating.

The state contends that different evidence supports the theft conviction. "A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent."  T.C.A. § 39-14-103.  The defendant admitted in his statement that when he realized that the victim was no longer moving, he wiped the blood from his hands and tried to revive the victim by shaking him and talking to him.  After sitting there for a period of time, the defendant said he turned a chair over onto the victim, took the car keys and a bag of marijuana from the victim's front pockets, took an envelope of money from the table, went outside, and left in the victim's car.  The state argues that although the defendant beat the victim in order to take money from him, the defendant only decided to take the car after the beating had taken place.  But even under the state's reasoning, the robbery of the victim was not complete until the defendant took the envelope of money, which according to the defendant's statement, occurred at the same time he took the keys and the marijuana and just before he left in the car.

15

In State v. Lowery, 667 S.W.2d 52, 53-54 (Tenn. 1984), our supreme court held that the defendant could not be convicted of both robbery with a deadly weapon and grand larceny that resulted from a single criminal act. In Lowery, the defendant used a gun to take money and car keys from a service station clerk, then he drove away in the clerk's car. The state argued that the jury could have found that the defendant formed the intent to steal the car subsequent to stealing the money and the keys. Id. at 57. The supreme court reasoned that for multiple convictions based upon such a subsequent intent to succeed, sufficient evidence must exist to support this inference. Id. Here, as in Lowery, the defendant took the money at the same time he took the keys, and he then took the victim's car.

The third step of the double jeopardy analysis looks to the number of victims and discrete acts. When there exists only one victim, as here, multiple convictions generally are not justified. See Denton, 938 S.W.2d at 381. "Discrete acts can justify multiple convictions." Id.; State v. Phillips, 924 S.W.2d 662, 664-65 (Tenn. 1996) (holding evidence of three discrete penetrations supported three aggravated rape convictions). As discussed, the evidence does not indicate that the aggravated robbery of the victim and the theft of the victim's car were two discrete acts because the defendant completed the robbery by taking the keys, marijuana and money immediately before he took the car.

The final step in the double jeopardy analysis is to consider the purposes behind the two statutes involved. Denton, 938 S.W.2d at 381; see Lowery, 667 S.W.2d at 54. In Lowery, our supreme court held that the statutory provisions defining robbery and larceny protected overlapping interests. Id. The court held that both protected property while robbery protected people as well. Id. The same reasoning also applies to aggravated robbery and theft.

16

After considering these four steps as they relate to each other, we believe that the defendant's convictions for both aggravated robbery and theft violate the principles of double jeopardy. The statutes are not distinct under Blockburger, the same evidence is needed to support both convictions, the offenses have a single victim and stem from a single act and the statutes have overlapping purposes. We hold that the finding of guilt for the theft conviction merges into the aggravated robbery conviction. The judgment of conviction for theft is vacated.

### III. JURY REQUEST TO REHEAR TESTIMONY

The defendant contends that the trial court erred in refusing the jury's request to rehear the testimony of Dr. Sandra Elkins, the state's expert in forensic pathology, once deliberations had started. The defendant argues that this court has upheld such a rehearing when reasonable, even over the defendant's objection. See State v. Jenkins, 845 S.W.2d 787 (Tenn. Crim. App. 1992). The defendant stresses that in this case, the defendant did not object to the rehearing and even went so far as to request that the trial court allow it. The state contends that the trial court did not abuse its discretion in refusing the rehearing to avoid placing undue emphasis upon one witness's testimony. The state further argues that even if the trial court erred, the defendant has not shown how he was prejudiced by the trial court's refusal of the jury's request. We hold that the trial court erred in refusing the jury's request to rehear testimony but that the defendant was not prejudiced by this error.

The trial court denied the jury's request to rehear the testimony of Dr. Elkins because it did not want to give undue emphasis to this one witness's testimony. In Jenkins, this court recognized the benefit gained from having jurors base their decisions on accurate recollections of the evidence. Id. at 792. It noted that a trial court does not emphasize the requested evidence by permitting it to be reheard; instead, it is the jury that has placed emphasis on this evidence. Id. This court held

17

that the rehearing of testimony after deliberations have begun is within the trial court's discretion as limited by ABA Standards Relating to the Administration of Criminal Justice 15-4.2 regarding jury trials:

> (a) If the jury, after retiring for deliberation, requests a review of certain testimony or other evidence, they shall be conducted to the courtroom. Whenever the jury's request is reasonable, the court, after notice to the prosecutor and counsel for the defense, shall have the requested parts of the testimony read to the jury and shall permit the jury to reexamine the requested materials admitted into evidence.
>
> (b) The court need not submit evidence to the jury for review beyond that specifically requested by the jury, but in its discretion the court may also have the jury review other evidence relating to the same factual issue so as not to give undue prominence to the evidence requested.

Id. at 793. This court further noted that the trial court had the "discretion to take such action as necessary, including denying the jury's request, to insure that the jury's determination of a factual issue would not be distorted by undue emphasis on particular evidence." Id. (emphasis in original).

In the present case, the trial court erred in refusing the jury's request to rehear Dr. Elkins' testimony. The ABA standard directs that the trial court shall permit the requested testimony to be reheard if the request is reasonable. Here, the jury was not asking for evidence that had yet to be created or given, nor were they asking to rehear everyone's testimony. Dr. Elkins was the only witness to give expert testimony as to the cause of death and the extent of the victim's injuries. The defendant, in his statement, gave an account of how the victim received these injuries. The defendant's account conflicts with Dr. Elkins' testimony that the victim had only defensive and no offensive wounds and her testimony regarding how the victim's vertebrae were broken. As suggested in subsection (b) of the ABA standard, the trial court could have avoided giving undue prominence to Dr. Elkins' account by having the jury also rehear the portion of the defendant's statement describing the altercation.

Although the refusal of the jury's request was error, the defendant has not shown how he was harmed. Even though Dr. Elkins testified that the bones of older individuals break more easily and that the victim's injuries could have resulted from falling into a table or the wall, her testimony that the victim had defensive wounds but no offensive wounds supported the state's theory that the victim did not participate in the "fight," but was attacked by the defendant. She stated that the victim's spinal cord was not severed, but she also testified that the victim's broken vertebrae were the result of a violent jerking or twisting of his head. The potential for her testimony to support inferences that the victim's injuries were sustained in mutual combat because the victim was merely the older and weaker of the two combatants was negated by other portions of her testimony. The jury convicted the defendant of the least degree of homicide existing rather than felony murder. Thus, it is logical to infer that the jury's inability to rehear this testimony did not harm the defendant.

## IV. SENTENCING

The defendant contends that the trial court imposed an excessive sentence because it improperly considered certain enhancement factors, improperly weighed other enhancement factors and failed to give any weight to the defendant's mitigating factors. The defendant also argues that consecutive sentences are not supported by a preponderance of the evidence. The state responds that in light of the number of applicable enhancement factors, the trial court properly imposed the maximum sentence for each conviction. The state also contends that consecutive sentences are appropriate because the defendant is a dangerous offender.

Appellate review of sentencing is de novo on the record with a presumption that the trial court's determinations are correct. T.C.A. §§ 40-35-401(d) and -402(d). As the Sentencing Commission Comments to these sections note, the burden is now on the appealing party to show that the sentencing is improper. This

means that if the trial court followed the statutory sentencing procedure, made findings of fact that are adequately supported in the record, and gave due consideration and proper weight to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act, we may not disturb the sentence even if a different result were preferred. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

However, "the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). In this respect, for the purpose of meaningful appellate review,

> the trial court must place on the record its reasons for arriving at the final sentencing decision, identify the mitigating and enhancement factors found, state the specific facts supporting each enhancement factor found, and articulate how the mitigating and enhancement factors have been evaluated and balanced in determining the sentence. T.C.A. § 40-35-210(f) (1990).

State v. Jones, 883 S.W.2d 597, 599 (Tenn. 1995).

Also, in conducting a de novo review, we must consider (1) the evidence, if any, received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct, (5) any mitigating or statutory enhancement factors, (6) any statement that the defendant made on his own behalf and (7) the potential for rehabilitation or treatment. T.C.A. §§ 40-35-102, -103, -210; see Ashby, 823 S.W.2d at 168; State v. Moss, 727 S.W.2d 229 (Tenn. 1986).

The sentence to be imposed by the trial court for a Class B, C, D or E felony is presumptively the minimum in the range if neither enhancement nor mitigating factors are present. T.C.A. § 40-35-210(c). Procedurally, the trial court is to increase the sentence within the range based upon the existence of enhancement factors and,

20

then, reduce the sentence as appropriate for any mitigating factors. T.C.A. § 40-35-210(d) and (e). The weight to be afforded an existing factor is left to the trial court's discretion so long as it complies with the purposes and principles of the 1989 Sentencing Act and its findings are adequately supported by the record. T.C.A. § 40-35-210, Sentencing Commission Comments; Moss, 727 S.W.2d at 237; see Ashby, 823 S.W.2d at 169.

At the sentencing hearing, Donald Jones testified that he first met the victim in 1989 or 1990 and that they were very good friends. Jones said that he knew the victim from the Greenway Pool Hall, that he sometimes worked around the pool hall as a volunteer and that occasionally he would run the pool hall for the victim. He said that the victim was a peaceful person. He stated that he had never seen the victim lose his temper, even when someone shot a hole in the victim's Coke machine. Jones said that the victim would always politely ask obnoxious customers to leave or to refrain from cursing in the presence of women or children.

Jones testified that he knew the defendant for a little over a year at the time the victim was killed. He said that the victim and the defendant were business acquaintances, that the defendant had worked on the victim's car and that the victim had loaned the defendant money and marijuana. Jones stated that he had never seen the defendant in a fight but that he knew the defendant had been in fights. He said he once overheard the defendant say that if anyone wanted to fight with the defendant, he would try to kill them. Jones testified that the defendant had once started to hit him with a pool stick. Jones also said that the defendant once explained his bloody hand by saying that he had hit a bed.

On cross-examination, Jones testified that the defendant was five feet, seven or eight inches tall, stocky and weighed between one hundred forty-five and one

21

hundred fifty pounds.  He admitted that the defendant and the victim could have seen each other when he was not around them, but he said that he never knew of the defendant running errands for the victim.  He stated that he knew the defendant would buff and wash the victim's car but that he thought this was a business arrangement.  He said that he knew that the defendant was supposed to work on the victim's truck but that the defendant never did.

Dr. Peter Young, a psychologist who specializes in clinical psychology and neuropsychology, testified that he first treated the defendant on April 5, 1996 and had met with him at the jail once a week since then.  He stated that the defendant is depressed and anxious and that this condition predates his incarceration.  He said that the defendant has had multiple substance abuse issues and has borderline personality disorder.  He also found the defendant to have learning problems and weak language skills.  He stated that the defendant has had problems since he was a little boy that could have stemmed, in part, from head injuries.

Dr. Young testified that the defendant needs to come to a more integrated sense of self.  He said that when the defendant becomes stressed, depressed or anxious, he will inflict physical injuries upon himself and during these times, he is psychotic.  He stated that the defendant has borderline personality disorder because in between these psychotic episodes, the defendant calms down to a more normal, rational state.  Dr. Young said that at the time the crimes were committed, the defendant was already in an altered state from alcohol, marijuana and cocaine use.  Dr. Young stated that the defendant related that he believes he was hit from behind, he turned and began striking the victim and continued to strike the victim.  Dr. Young testified that he believes the defendant was not in a normal state of mind at the time of the offenses.

Dr. Young testified that the defendant's mental condition has improved over the last year and that the defendant now takes antidepressants. He said that the defendant has repeatedly brought up his feelings of guilt and remorse and his inability to imagine how he can make up for what has happened. Dr. Young said that the defendant told him that he does not envision ever forgiving himself for the offenses.

On cross-examination, Dr. Young testified that borderline personality disorder involves intermittent breaks with reality and that these breaks can be violent. He stated that the defendant still poses a threat to his own safety but that due to the defendant's remorse, the chance of him injuring others in the future is unlikely. He stated that if the defendant drinks alcohol or uses cocaine again, he could pose a danger to others as well as to himself but that he believed the defendant was sincere in his decision not to use these substances again.

A presentence report was introduced into evidence. It reflects that the then twenty-four year old defendant studied auto mechanics in high school but that he dropped out after ninth grade. It reflects that the defendant reported beginning to use alcohol at age fourteen, marijuana at sixteen and cocaine at twenty-one. The defendant stated that by the time he was twenty-two, he used one hundred dollars worth of cocaine a week and that he was under the influence of cocaine when he committed the offenses. The report shows that the defendant worked four months as a fork-lift operator before being arrested in this case. The report reveals that before taking the fork-lift operator position, the defendant had resigned from a job as a mechanic, which he had held for three years. The defendant had six misdemeanor convictions from September 1992 through May 15, 1996, four of which occurred after the offenses in this case. The defendant's probation for misdemeanor theft was revoked on September 1, 1992. The report reflects an extensive juvenile record beginning in November of 1986 and including assault with a knife, shoplifting, several

23

probation violations, attempting to start a fire in a group home, illegal consumption of alcohol and twice being beyond parental control.

Ms. Arlena Ruther, the victim's daughter, gave a statement in which she described the effect that the victim's death has had on her family. She stated that although her father had been portrayed as a drug addict and a bookie who had a lot of money and guns lying around his house, he was a kind, generous person who had overcome alcoholism and did not use drugs. She testified that several family members now take antidepressants, one has anxiety attacks, and another is on the verge of a nervous breakdown as a result of the offenses. She asked that the defendant receive the maximum sentence possible for these offenses.

The defendant addressed the court before he was sentenced and stated that he realized what he had done and that he was sorry. The trial court sentenced the defendant as a Range I, standard offender to twelve years for the aggravated robbery, two years for the criminally negligent homicide and four years for the theft conviction, to be served consecutively.

## A. ENHANCEMENT AND MITIGATING FACTORS

The trial court applied the following eight enhancement factors as listed in T.C.A. § 40-35-114:

> (1) The defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range;
>
> (4) A victim of the offense was particularly vulnerable because of age or physical or mental disability . . .;
>
> (5) The defendant treated or allowed a victim to be treated with exceptional cruelty during the commission of the offense;
>
> (6) The personal injuries inflicted upon or the amount of damage to property sustained by or taken from the victim was particularly great;

24

(7) The offense involved a victim and was committed to gratify the defendant's desire for pleasure or excitement;

(8) The defendant has a previous history of unwillingness to comply with the conditions of a sentence involving release in the community;

(10) The defendant had no hesitation about committing a crime when the risk to human life was high; [and]

(20) The defendant was adjudicated to have committed a delinquent act or acts as a juvenile that would constitute a felony if committed by an adult.

The defendant argues not only that the trial court misapplied these factors but also that the trial court was not clear as to how it applied these factors to the convictions for criminally negligent homicide and theft. The defendant contends that our review should be de novo without the presumption of correctness with regard to the convictions for criminally negligent homicide and theft. As noted above, the judgment of conviction for theft is vacated, therefore, we will address the defendant's contentions with regard to the convictions for aggravated robbery and criminally negligent homicide.

A trial court is required to state specifically how the facts indicate enhancement or mitigation with respect to each conviction. See T.C.A. § 40-35-210(f). A trial court's failure to do so will normally result in a remand of the case. See State v. Clifton, 880 S.W.2d 737, 745 (Tenn. Crim. App. 1994). However, from the trial court's direct references to the aggravated robbery conviction, indirect reference to the criminally negligent homicide conviction when discussing its belief that the defendant did not go to the victim's house to enjoy killing someone under factor (7) as reflected in the jury's verdict, and its obvious application of the enhancement factors to enhance both convictions up to the maximum sentence within the range, we assume that the trial court's discussion of the enhancement and mitigating factors applied to both convictions.

25

With regard to enhancement factor (1), the trial court found that the defendant had a pattern of criminal behavior starting at age thirteen when the defendant was found delinquent for assault with a knife. The trial court found that the defendant was declared a serious habitual offender as a juvenile, had a misdemeanor conviction for theft when he was eighteen and has had a misdemeanor conviction every year from 1994 until his present convictions in 1997. Thus, the court found that the defendant had many more offenses than that necessary to establish him as a Range I, standard offender.

The defendant argues that the bulk of his prior criminal history relates to driving on a suspended license. The defendant contends that because he had never been charged with a felony, this factor should not be given any weight. Enhancement factor (1) is not limited to felonies but instead extends to any criminal convictions or behavior above that needed to establish the defendant's range. A defendant qualifies as a Range I offender when he does not fall within any of the other higher ranges. See T.C.A. § 40-35-105. Thus, all of the defendant's prior convictions qualify under this factor because none were needed to establish the range itself. The defendant had misdemeanor convictions for theft on October 29, 1991, and on March 16, 1994, for driving while his license was suspended on October 30, 1995 and on May 15, 1996, for driving with a revoked license on May 15, 1996, and for a violation of the bad check law on May 15, 1996.

However, we believe that the trial court improperly relied on the defendant's juvenile record to support factor (1). This court has held that when the legislature enacted enhancement factor (20) in 1995, factor (20) became the exclusive means for using juvenile offenses to enhance a defendant's sentence for offenses occurring after July 1, 1995. State v. Brent Brown, No. 02C01-9710-CC-00419, Hardeman County, slip op. at 5-6 (Tenn. Crim. App. Oct. 26, 1998). On the other hand,

26

the record supports consideration of the defendant's admitted use of controlled substances as criminal behavior under factor (1). Although the trial court improperly considered the defendant's juvenile record with regard to this factor, factor (1) was properly applied to both convictions in light of the defendant's misdemeanor convictions and admitted substance abuse.

The trial court applied enhancement factor (4), finding that the victim was particularly vulnerable because he was sixty-three years old and suffered from emphysema. The trial court gave this factor less weight than the others. The defendant contends that the trial court erred in considering this factor because this factor relates to the victim's physical and mental limitations, rather than merely his age. The defendant argues that the victim had no mental or physical defects, that he ran a pool hall and that he was apparently able to function as fully as any other sixty-three year old man. In assessing vulnerability under this factor, the trial court should "consider whether evidence in the record with regard to the victim's age or physical or mental attributes demonstrated an inability to resist the crime, summon help, or testify at a later date." State v. Poole, 945 S.W.2d 93, 96 (Tenn. 1997); State v. Adams, 864 S.W.2d 31, 35 (Tenn. 1993). The record must contain evidence other than the victim's age and must relate to the victim's condition at the time the offense was committed. Poole, 945 S.W.2d at 97.

The defendant apparently ignores the evidence given by Dr. Elkins that the victim suffered from emphysema which made it more difficult for him to try to survive the injuries inflicted by the defendant. This condition would have also affected his ability to resist the beating and to call for help during the offense. The trial court properly applied factor (4) to enhance the convictions for aggravated robbery and criminally negligent homicide.

27

With regard to enhancement factor (5), the trial court found that the victim's injuries were significant, that blood was found all around the scene, that the injuries inflicted by the defendant caused the victim a great deal of pain and suffering before he died, and that the victim's death resulted in part from his inability to breathe. The defendant contends that the trial court should not have considered this factor because it was not supported by the evidence. The defendant argues that Dr. Elkins testified that the victim received ten moderate to severe blows, that these blows were mostly to the body rather than the head, and that the victim's skull was not fractured. Additionally, the defendant argues that he did not mutilate or degrade the victim's body.

The trial court properly applied factor (5) to enhance the aggravated robbery conviction. Exceptional cruelty is not an element of aggravated robbery nor is it automatically established by proof of serious bodily injury. See Poole, 945 S.W.2d at 98 (holding that factor (5) may be used to enhance an especially aggravated robbery conviction). "[T]he facts in a case may support a finding of 'exceptional cruelty' that 'demonstrates a culpability distinct from and appreciably greater than that incident to' the crime." Id. (quoting State v. Jones, 883 S.W.2d 597, 603 (Tenn. 1994)). In Poole, our supreme court relied upon a finding that after striking the seventy-year-old victim in the head with a baseball bat, the defendants, who knew the victim lived alone, left the victim unconscious and bleeding, and she was not discovered until the next day. The supreme court held that this evidence supported an enhancement of the especially aggravated robbery sentence for exceptional cruelty under factor (5). Id. at 99.

In the present case, the defendant beat the victim until he was motionless, covered his face with a recliner and left the house locking the door behind him. The victim, who could have lived for one and one-half hours after the beating, was discovered the next day. We believe the record supports a finding of exceptional cruelty. Exceptional cruelty is not an element of criminally negligent homicide, and

28

therefore, we hold that factor (5) was properly applied to this conviction under the same reasoning. See T.C.A. § 39-13-212.

The trial court found that enhancement factor (6) should be given little weight because it found that aggravated robbery usually involved considerable property damage and because it had already applied factor (5) with regard to the extent of the victim's injuries. The defendant contends that particularly great personal injuries under factor (6) equate with serious bodily injury which is an element of aggravated robbery. See Jones, 883 S.W.2d at 602. Particularly great injury is also an essential element of criminally negligent homicide because no greater injury than death can be inflicted upon a person. See State v. Lambert, 741 S.W.2d 127, 134 (Tenn. Crim. App. 1987). This factor was improperly applied to both convictions.

With regard to enhancement factor (7), the trial court found that although the defendant did not derive pleasure or excitement from the act of killing the victim, this factor could be applied because the defendant injured the victim in order to get money to purchase drugs. Thus, the trial court found that offenses were committed so that the defendant could satisfy his desire for the drugs which brought him pleasure or excitement. The defendant argues that the trial court should not have considered this factor because the record contains no proof that the defendant committed these offenses by engaging in what the jury determined to be negligent conduct in order to gratify his desire for pleasure or excitement. This court has held that the state failed to meet its burden of proof with regard to this factor when the proof demonstrated that the defendant stole from the victim in order to buy drugs. State v. Antonio D. Mason, No. 01C01-9607-CC-00315, Bedford County, slip op. at 7-8 (Tenn. Crim. App. Oct. 24, 1997) (citing State v. Chad Douglas Poole, No. 02C01-9506-CC-00178, Hardeman County, slip op. at 6 (Tenn. Crim. App. Jan. 31, 1996), aff'd 954 S.W.2d 93 (Tenn.

29

1997) (not discussing this enhancement factor)). Thus, the trial court erred in applying factor (7) to both convictions.

In applying enhancement factor (8), the trial court found that the defendant exhibited a previous unwillingness to comply with conditions of his release into the community because the defendant's probation was revoked with regard to one of his misdemeanor convictions. The defendant argues that this factor should be given little weight because the defendant's probation was revoked when he was a juvenile struggling with divorced parents. The trial court did not rely on the defendant's juvenile probation revocations to support this factor but referred instead to the revocation of his 1991 suspended sentence for misdemeanor theft when the defendant was nineteen years old. The trial court properly applied this factor to both convictions.

The trial court applied enhancement factor (10), finding that the defendant had no hesitation in committing this crime because he gave no thought to the crime itself but was instead thinking only of the cocaine he wanted. The defendant argues that factor (10) cannot be used to enhance an aggravated robbery conviction because it is an element of the offense. See State v. Claybrooks, 910 S.W.2d 868, 872-73 (Tenn. Crim. App. 1994). When determining the applicability of factor (10), we focus on whether the defendant created a high risk to human life. Jones, 883 S.W.2d at 602. This factor represents a legislative determination that "acts which cause high risk to human life may establish culpability beyond that necessary for conviction of a charged offense." Jones, 883 S.W.2d at 603. Thus, for factor (10) to apply, the facts establishing the high risk to human life must demonstrate a culpability greater than that necessary to establish the offense. Id.

In this case, the defendant committed the offenses upon the victim while he was alone in his home, thus his culpability did not go beyond that involved in the

30

aggravated robbery. See Claybrooks, 910 S.W.2d at 873 (holding that the "offense of aggravated robbery necessarily entails a high risk to human life"). Factor (10) is not applicable to the criminally negligent homicide committed when only the victim and the defendant were present because a high risk to human life always accompanies the commission of a homicide. See State v. Bingham, 910 S.W.2d 448, 452-53 (Tenn. Crim. App. 1995) (noting that factor (10) does not apply to vehicular homicide when the defendant presents no risk to the life of anyone other than the victim). The trial court erred in applying this factor to both convictions.

The trial court also enhanced the defendant's convictions with enhancement factor (20), finding that both the 1986 assault with a knife and the 1988 attempt to start a fire in a residence, which were committed while the defendant was a juvenile, would have constituted felonies had the defendant been an adult. The defendant concedes that this factor applies but argues that it should be given little weight because the defendant was thirteen years old at the time of the assault. We note that the presentence report reflects that the defendant was sixteen at the time he attempted to start the fire. The weight to be given an enhancement factor is within the sound discretion of the trial court. Nothing in the record indicates that the trial court abused that discretion. The trial court properly applied this factor to both convictions.

The defendant requested that the trial court consider the following factors in mitigation:

> (2) The defendant acted under strong provocation;
>
> (8) The defendant was suffering from a mental or physical condition that significantly reduced the defendant's culpability for the offense; however the voluntary use of intoxicants does not fall within the purview of this factor; [and]
>
> (11) The defendant, although guilty of the crime, committed the offense under such unusual circumstances that it is unlikely that a sustained intent to violate the law motivated the criminal conduct.

31

T.C.A. § 40-35-113. The defendant also lists factor (13), the catch-all provision, in his brief, but he does not specify how this factor is applicable. We conclude that it is not.

The trial court rejected the application of mitigating factor (2), finding that even if the defendant thought that the victim hit him or even if the victim did hit him, the injuries that the defendant inflicted upon the victim went far beyond self-defense. The trial court refused to give much weight to factor (8), finding that although Dr. Young stated that the defendant could not always control himself, the cocaine that the defendant had ingested was a significant factor in the defendant's inability to control himself at the time of the offense. Because the use of voluntary intoxicants cannot be considered under factor (8), the court gave that factor little weight. The trial court found that factor (11) did not apply because the defendant's sustained intent to violate the law was his desire to obtain drugs. Without pointing to any specific errors on the part of the trial court, the defendant contends that the trial court ignored the mitigating factors. The trial court specifically addressed the three factors presented by the defendant and made its findings based upon evidence in the record. The defendant's argument with regard to the mitigating factors is without merit.

The trial court properly applied enhancement factors (1), (4), (5), (8) and (20) to the convictions for aggravated robbery and criminally negligent homicide. The trial court found that only factor (8) applied in mitigation, and it gave this factor little weight. In light of the number and significance of the applicable enhancement factors and the little weight given the sole mitigating factor, we affirm the trial court's imposition of the maximum sentence for both of the convictions.

## B. CONSECUTIVE SENTENCING

32

The defendant contends that the trial court erred in ordering his sentences to be served consecutively because the state did not prove by a preponderance of the evidence that the defendant is a dangerous offender. We disagree.

Consecutive sentencing is guided by T.C.A. § 40-35-115(b), which states in pertinent part:

> The court may order sentences to run consecutively if the court finds by a preponderance of the evidence that:
>
> . . . .
>
> (2) The defendant is an offender whose record of criminal activity is extensive;
>
> . . . .
>
> (4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high.

Furthermore, "consecutive sentences cannot be imposed unless the terms reasonably relate to the severity of the offenses committed and are necessary in order to protect the public from further serious criminal conduct by the defendant." State v. Wilkerson, 905 S.W.2d 933, 938 (Tenn. 1995). Rule 32(c)(1), Tenn. R. Crim. P., requires that the trial court "specifically recite the reasons" behind its imposition of a consecutive sentence.

In the instant case, the trial court determined the defendant to be a dangerous offender. The trial court found that the defendant was a danger to himself and to others, especially if he used drugs again. Also, the trial court found that the defendant had an extensive record with some violence in his past. The court expressed concern that the defendant would eventually be released into the community. The trial court noted that although it thought the defendant's remorse was genuine, the defendant had not been able to control his cocaine use and that unless he were able to control it, these crimes would happen to someone else.

33

The record supports the trial court's findings. Although he was only twenty-two at the time he committed the present offenses, the defendant's criminal record shows continuous criminal behavior from the age of thirteen, including assault with a knife, forgery and theft of property up to five hundred dollars in value. He has demonstrated no signs of rehabilitation over this extensive criminal history. At sixteen, he was declared a serious habitual juvenile offender. His probation was revoked as a result of an adult misdemeanor conviction. The instant offenses were particularly violent. The determination that the defendant is a dangerous offender is supported by a preponderance of the evidence.

The defendant has admitted drug abuse since age sixteen, with alcohol use predating the drug use. Dr. Young's testimony that the defendant would continue to be a danger to himself and to others if he used drugs, in combination with the defendant's lack of self control, supports a finding that consecutive sentences are necessary to protect the public from further crimes by the defendant. Finally, the record also supports a determination that consecutive sentences would be reasonably related to the severity of the offenses. The defendant brutally beat the victim, ultimately causing his death. The effective fourteen-year sentence imposed by the trial court is supported by the record.

We affirm the judgments of conviction for criminally negligent homicide and aggravated robbery. However, we vacate the judgment of conviction for theft and merge this conviction into the judgment of conviction for aggravated robbery.

_____
Joseph M. Tipton, Judge

CONCUR:

34

_____
Joe G. Riley, Judge


_____
James Curwood Witt, Jr., Judge