# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

## AT NASHVILLE

### FEBRUARY 1999 SESSION



FILED

March 30, 1999

Cecil W. Crowson
Appellate Court Clerk

| | | |
|---|---|---|
| **CHARLES EDWARD MEEKS,** | ) | |
| | ) | |
| Appellant, | ) | **C.C.A. No. 01C01-9807-CC-00295** |
| | ) | |
| vs. | ) | **Grundy County** |
| | ) | |
| **STATE OF TENNESSEE,** | ) | **Hon. Thomas W. Graham, Judge** |
| | ) | |
| Appellee. | ) | **(First Degree Murder)** |
| | ) | |

FOR THE APPELLANT:

DOUGLAS TRANT
Riverview Tower, Suite 1502
900 S. Gay Street
Knoxville, TN 37902

FOR THE APPELLEE:

JOHN KNOX WALKUP
Attorney General & Reporter

KIM R. HELPER
Assistant Attorney General
425 Fifth Avenue North
Nashville, TN 37243-0493

J. MICHAEL TAYLOR
District Attorney General
Third & Market Streets
Dayton, TN 37321

THOMAS D. HEMBREE
Asst. District Attorney
Lawyers Building
Jasper, TN 37347

OPINION FILED: _____

**AFFIRMED**

**JAMES CURWOOD WITT, JR., JUDGE**

**OPINION**

The petitioner, Charles Edward Meeks, appeals the Grundy County Circuit Court's dismissal of his petition for post-conviction relief. He alleges the ineffective assistance of trial counsel in two respects. First, he alleges that trial counsel was ineffective in failing to prepare and present evidence at trial of the defendant's lack of capacity for intent to commit murder and in failing to seek a jury instruction regarding such "diminished capacity." Second, he asserts trial counsel was ineffective because he declined to make an opening statement to the jury. After hearing oral argument and reviewing the record and the applicable law, we affirm the judgment of the lower court.

The petitioner was convicted on October 6, 1994 for the February 26, 1994 first degree murder of Charles Coffelt, the petitioner's brother-in-law. He received a life sentence. His conviction was affirmed by this court, and his application for permission to appeal to the supreme court was denied. See State v. Charles Edward Meeks, No. 01C01-9506-CC-00170 (Tenn. Crim. App., Nashville, Nov. 21, 1995), perm. app. denied (Tenn. May 6, 1996).

The following excerpt from this court's opinion in the direct appeal of the petitioner's conviction discloses pertinent factual background in the case.

> In January, 1994, the defendant was shot in the forehead with a .22 caliber bullet. The bullet lodged in his right frontal sinus and remained there for several months. On February 19, 1994, the defendant was admitted to the hospital to have an abscess treated that had formed around the wound. He was discharged from the hospital on Wednesday, February 23, 1994, and was given two Percocets and a prescription for antibiotics. Percocet is a Schedule II drug used for moderate pain.
>
> On Saturday, February 26, 1994, the defendant was suffering from a severe headache. Rose Meeks, the defendant's ex-wife, called a doctor at the hospital where the defendant had been treated, who prescribed Percocet for the defendant's pain. At about 4:00 p.m., Ms. Meeks drove the defendant to the hospital where she picked up the prescription. Ms. Meeks then drove to a pharmacy and had the prescription filled. Between 6:00 and 8:30 p.m., she gave the paper bag containing the prescription bottle to the defendant, who immediately took "some" of the drug. On the way home from the hospital, Ms. Meeks stopped at a liquor store and the defendant purchased some liquor.

After arriving home at approximately 10:30 p.m., the defendant prepared a mixed drink for himself and Ms. Meeks. He also took some more Percocet. The defendant testified that he had taken a total of four to five Percocets that day. Shortly after they arrived home, Ms. Meeks invited Ann Coffelt and the victim, Charles Coffelt, over for a visit. Upon the Coffelts' arrival between 11:00 and 11:30 p.m., the defendant mixed himself another drink and also fixed one for the victim. The defendant testified that he had had no other alcohol that day.

After visiting for a few minutes, the defendant and the victim began arguing. Although the exact sequence of events was disputed at trial, the defendant testified that the victim had struck him with his fist "right between the eyes." He testified that, after hitting him, the victim "came back at me again with another right," at which point the defendant produced a pistol and shot the victim twice. Although the defendant subsequently administered CPR to the victim, Mr. Coffelt died a short time later. The defendant was taken into police custody at approximately 11:45 p.m., and gave a sworn statement at approximately 2:00 a.m. on February 27, 1994. The TBI agent who took the statement testified that the defendant was "very nervous" but "sober."

The defendant pled not guilty to first-degree murder and relied on self-defense. At trial, the defendant's counsel advised the court that he would be offering proof on the issue of voluntary intoxication. At the conclusion of closing arguments, defense counsel requested a jury instruction on the defense of involuntary intoxication. The trial court denied this request, finding that there was "not sufficient evidence in the record to warrant that charge." The trial court did, however, charge the jury with the law on voluntary intoxication. . . . The defendant testified that, on the day he shot the victim, he had introduced both alcohol and Percocet into his body. The surgical resident who treated the defendant's abscess testified that the side effects of Percocet include light-headedness, dizziness, and sleepiness, and that it produces results similar to intoxication. He further testified that alcohol would magnify the effects of Percocet. The defendant testified that he had gotten "a little dizzy" right before the victim allegedly hit him.

The post-conviction court conducted an evidentiary hearing. Trial counsel testified that he relied upon the theories of self-defense and intoxication. He was aware that the petitioner had a bullet lodged in his sinus cavity and that he was under the influence of both prescribed pain medication and alcohol. Counsel considered an insanity defense but withdrew it after receiving a psychological report that indicated the petitioner's competency. As to his failure to make an opening argument, he stated (1) that he did not wish to alert the state to prepare rebuttal as to any issues the state may have overlooked and (2) that in the past he had experienced regret in making opening statements when he had difficulty backing

3

them up with proof. On this last point, he stated that he did not know at the beginning of the trial whether the petitioner's wife would testify and that, in light of this uncertainty, he did not know what he could prove.

The petitioner called as an expert witness Dr. Pamela Auble, a clinical neuropsychologist. She had examined the trial transcript, the Erlanger Hospital reports from the defendant's February 1994 treatment, various letters and notes pertaining to the case, and the defendant's pretrial statement. On August 15, 1996, she spent five hours at Southeast Tennessee Regional Correctional Facility interviewing the petitioner and administering neuropsychological and personality tests to him. She attributed the defendant's actions in shooting Coffelt to a combination of factors. She cited two long-term factors -- a low IQ in the borderline retarded range and a "pretty low self esteem." As to the latter factor, she opined that the petitioner "tends to be tense and anxious and he gets easily upset by anything that he perceives as criticism." She stated that these two long-term factors combined with other factors of more recent derivation. She referred to the petitioner's January 1994 gunshot injury and, noting that the petitioner's medical records indicated the defendant had a seizure while in the hospital, she opined that "he probably had at least like a concussion." She testified that "up to a year after a concussion people exhibit signs of poor reasoning and memory, they're kind of addled. . . . [T]he post concussion syndrome would be something that would have been influencing his behavior at the time of the killing." She opined that the defendant's low mental functioning would be worsened by the "post concussion syndrome." Further, she cited the headache pain the defendant was experiencing on the night of the shooting and said, "Your being in pain makes you perceive the world differently. You don't reason about things as well, you don't think as clearly, you're more easily upset." Another contributing factor was the combination of excessive amounts of Percocet pain medication and alcohol which would have "further compromised or effected [sic] his reasoning, his memory, his ability to think about situations to control himself, and to otherwise act in a reasonable fashion."

4

Finally, Dr. Auble opined that the petitioner's emotional stress at the time of the shooting was a contributing factor. She referred to his recent head injury, his marital difficulty, and the blow to his head from Coffelt's fist. When asked by post-conviction counsel whether she had an opinion as to the petitioner's capacity to form specific intent to shoot Coffelt, she responded, "Given all the things that were going on with him at that time, and his state of mind, it is my opinion that he did not have the capacity to form a specific intent, a cool, premeditation at that time."

On cross-examination, Dr. Auble agreed with the pretrial determinations that the defendant was competent and that an insanity defense could not have been supported.

The petitioner testified at the hearing. He said, "Mr. Coffelt and me both was drunk and I'm sure that if he hadn't a been drinking he never would have hit me, and I'm sure that if I hadn't a been drinking and on medication I would not have done what I done." Despite this testimony, he maintained that he did not testify truthfully at trial. He said he did not remember what happened on the night of the shooting and that he testified according to his counsel's instructions.

In dismissing the petition, the post-conviction court found that, if the failure to present "diminished capacity" evidence was deficient performance of counsel, it was not prejudicial. The court remarked that the jury was aware of the petitioner's existing head injury, his use of Percocet and alcohol and their effects, and the petitioner's illiteracy. The judge commented that the jury received pertinent information about "diminished capacity" through the voluntary intoxication instruction and through the general instructions on the burden of proof. The court said that the pretrial mental examination did not support an insanity defense and did not alert counsel to a "diminished capacity" claim. The court found the petitioner to be "less than credible" as a witness.

5

As to the failure to make an opening statement, the lower court ruled that the issue provided no basis for post-conviction relief because trial counsel made a tactical decision to waive the statement.

For post-conviction petitions filed after May 10, 1995, "[t]he petitioner shall have the burden of proving the allegations of fact by clear and convincing evidence." Tenn. Ann. Code § 40-39-210(f) (1997). The post-conviction court's findings of fact are afforded "the weight of a jury verdict and are conclusive on appeal unless the evidence in the record preponderates against those findings." State v. Henley, 960 S.W.2d 572, 578 (Tenn. 1997), cert. denied - - - U.S. - - - , 119 S. Ct. 82 (1998). As a appellate court, we do not reweigh or reevaluate the evidence, nor do we "substitute our inferences for those drawn by the trial judge." Id. at 579. The burden is on the appellant to demonstrate that the evidence preponderates against the post-conviction court's findings. Id.

## I.

The petitioner alleges that trial counsel was ineffective because he failed to use proof of the defendant's "diminished capacity" to intend to kill.[1] "Diminished capacity" is not a defense in Tennessee. State v. Phipps, 883 S.W.2d 138, 149 (Tenn. 1994). Our supreme court has discouraged the use of the phrase "diminished capacity" because it poorly reflects the proper use of the evidence to "negate the existence of the culpable mental state required to establish the criminal offense." State v. Hall, 958 S.W.2d 679, 690 (Tenn. 1997, cert. denied, - - - U.S. - - - 118 S. Ct. 2348 (1998). In the present case, the petitioner claims trial counsel was remiss in not presenting certain evidence that would negate the intent or premeditation and deliberation elements of first degree murder.

---

[1] There is no allegation that trial counsel deficiently performed in the sentencing of the defendant. There was no sentencing hearing. The state sought neither the death penalty nor a life sentence without the possibility of parole. Therefore, the jury's finding of guilt of first degree murder resulted in the trial court automatically sentencing the defendant to incarceration for life. See Tenn. Code Ann. § 39-13-208(c) (1997).

We affirm the trial court's denial of post-conviction relief on this issue, although we base our decision on different grounds than the trial court used. The trial court found that, if trial counsel performed deficiently, the record established no prejudice. On the other hand, we hold that the record fails to establish deficient performance.

When a defendant uses expert psychiatric testimony to prove he or she lacked the capacity to intend the crime, "the psychiatric testimony must demonstrate that the defendant's inability to form the requisite culpable mental state was the product of a mental disease or defect, not just a particular emotional state or mental condition." Hall, 958 S.W.2d at 690 (emphasis added). In Hall, the defendant asserted trial court error in disallowing his psychiatric expert to testify about his "diminished capacity" to intend murder. The defense wanted to prove that Hall's "consumption of alcohol would have had [an effect] on him with his type of personality" and that he was under "emotional distress and stress." Id. At the sentencing hearing, the expert testified Hall had "a borderline personality disorder and that such people could have brief episodes of rage during 'temporary states of mental illness.'" Id. at 691. Our supreme court rejected Hall's claim and held that "[t]hough expert testimony is admissible to show that because of a mental disease or defect, a defendant lacked the capacity to form the mental state required to constitute the offense. . . , the testimony in this case did not meet that standard." Id. at 692.

The evidence proposed by Hall failed in three respects. First, the expert did not propose to testify that Hall "lacked the capacity to premeditate and deliberate the killing because of a mental disease or defect." Id. at 691. Second, the expert spoke only abstractly and generally about typical persons with personality types similar to Hall's type, instead of discussing "the capacity of the particular defendant on trial." Id. Third, the "personality type and character traits which [the expert] gleaned from test results and a single three hour interview" do not equate

7

to proof of "a defendant's *capacity* to form the mental intent." Id. (italics in original). The court quoted with approval Judge Tipton's comment that

> The mere fact that one is more apt, by personality type, to become emotional in response to a particular stimulus does not provide a means for that person to be absolved from the same responsibility to which the law holds another who might be less apt to respond as passionately to the same stimulus. If it did, then each person would be the law unto himself or herself based solely upon his or her particular personality makeup.

Id. at 692 (quoting State v. Leroy Hall, Jr., No. 03C01-9303-CR-00065, slip op. at 18 (Tenn. Crim. App., Knoxville, Dec. 30, 1996)).

In the present case, we are unable to conclude that the testimony of Dr. Auble would be admissible under the standard of Hall. Although Dr. Auble did opine that the petitioner lacked the capacity to specifically intend or to premeditate and deliberate the killing, she did not opine that his incapacity was because of a mental disease or defect.

Furthermore, we cannot glean from the record that any such incapacity is based on mental disease or defect. Dr. Auble based her finding of incapacity on a combination of factors. However, severe headache pain, stress over marital discord, low self-esteem, and antipathy to criticism are either episodic in nature, manifestations of emotional responses, or simply suggestive of personality type. As such, these factors do not implicate mental disease or defect. See Hall, 958 S.W.2d at 691-92. Voluntary intoxication, though a factor cited by Dr. Auble, was raised at trial and explained to the jury. The remaining factors are (1) the post concussion syndrome and (2) the defendant's low IQ. We discuss these factors in more detail.

Dr. Auble's testimony about "post concussion syndrome" was based upon a reference in a hospital record that the petitioner had a seizure, "and so he probably had at least like a concussion." (Emphasis added.) The facts underlying the opinion that the petitioner actually sustained a concussion indicate a lack of trustworthiness. See Tenn. R. Evid. 703. Had this evidence been presented, the

8

trial court would have been within its discretion in "disallow[ing] testimony in the form of [such] an opinion or inference." Id. Additionally, the opinion about "post concussion syndrome" relates to "people [who] exhibit signs of poor reasoning and memory" up to a year after a concussion. "They," Dr. Auble said, "don't think as clearly as they used to." Based upon these findings, she opined that post concussion syndrome would be "something that would have been influencing his behavior" three years earlier when the shooting occurred. This testimony is reminiscent of the proposed expert testimony in Hall. Generalizations about typical reactions are "not relevant to the capacity of the particular defendant on trial." Hall, 958 S.W.2d at 691. From all of the above, we conclude Dr. Auble's testimony about "post concussion syndrome" failed to establish an incapacity that was derived from mental disease or defect.

Next, we assess Dr. Auble's testimony about the petitioner's "low IQ . . . in the borderline retarded range." We have reviewed the trial record from the defendant's direct appeal and agree that the jury did not hear any evidence about the defendant's low IQ.

First, we note that the terms "mental disease" and "mental defect" are phrases of legal import and do not have currency in modern psychological parlance.[2] Therefore, we look to legal scholarship to determine whether mental retardation is either a mental disease or mental defect.

Our legislature has defined "mental diseases or defect" as follows:

Insanity - (a) Insanity is a defense to prosecution if, at the time of such conduct, as a result of mental disease or defect, the person lacked substantial capacity either to appreciate the wrongfulness of the person's conduct or to conform that conduct to the requirements of law.
(b) As used in this section, "mental disease or defect" does not include any abnormality manifested only by repeated criminal or otherwise antisocial

---

[2] The phrases "mental disease" and "mental defect" are not listed as defined terms in American Psychiatric Glossary (American Psychiatric Press, 7th ed.). Neither are they listed in the index in American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders, Number 4, Diagnostic Criteria (1995).

9

conduct.

Tenn. Code Ann. § 39-11-501 (1991) (amended 1995)

> Definitions - The following definitions apply in [sex offenses] unless the context otherwise requires:
>
> (3) "Mentally defective" means that a person suffers from a mental disease or defect which renders that person temporarily or permanently incapable of appraising the nature of such person's conduct.

Tenn. Code Ann. § 39-13-501(1991 ) (amended 1995). This court has approved a jury charge as a correct statement of the law which defined "mental disease or defect" as "any abnormal condition of a mind which substantially affects mental or emotional processes and impairs the behavior controls." State v. Max, 714 S.W.2d 289, 295 (Tenn. Crim. App. 1986).

These definitions do not exclude mental retardation as a form of "mental disease or defect." In at least one case, we have recognized the legitimacy of mental retardation as a facet of an insanity claim. State v. Haun, 695 S.W.2d 546 (Tenn. Crim. App. 1985). In Haun, this court held that the trial court erred in disallowing defense proof that Haun, as a premature infant, suffered "an hypoxic episode, depriving the infant of oxygen and resulting in brain damage." Haun, 714 S.W.2d at 549.

In Penry v. Lynaugh, 492 U.S. 302, 109 S. Ct. 2934 (1989), the Supreme Court considered the constitutionality of subjecting mentally-retarded defendants to capital punishment, especially in light of that court's earlier ruling that insane persons may not receive the death penalty. Id. at 334, 109 S. Ct. at 2955 (citing Ford v. Wainwright, 477 U.S. 399, 410, 106 S. Ct. 2595, 2603 (1986)). In the context of whether the death penalty could be imposed, the court examined the nature of mental retardation vis-a-vis insanity. The court said, "It was well settled at common law that 'idiots,' together with 'lunatics,' were not subject to punishment for criminal acts . . . ." Id. at 331, 109 S. Ct. at 2953. Idiocy, the court said, was "'a defect of understanding from the moment of birth.'" Id. (emphasis added). It was a term "generally used to describe persons who had a total lack of reason or

10

understanding, or an inability to distinguish between good and evil." Id. at 331-32, 109 S. Ct. at 2954. This common law aversion to punishing idiots or lunatics was the matrix of the insanity defense, "which today includes 'mental defect' as well as 'mental disease" as part of the legal definition of insanity," and the "notion" of idiocy bears some relation to the modern definition of mental retardation." Id. at 332, 109 S. Ct. at 2954. However, the court pointed out, the common law aversion to punishing "idiots" was limited "to persons of such severe disability that they lacked the reasoning capacity to form criminal intent or to understand the difference between good and evil." Id. at 333, 109 S. Ct. at 2954 (emphasis added). "Idiocy" referred to "the most retarded of persons, corresponding to what is called 'profound' and 'severe' retardation today." Id. The Penry court concluded that mental retardation alone, "apart from any individualized consideration of the [defendant's] personal responsibility," does not exempt a defendant from criminal sanctions, including the death penalty. Id. at 340, 109 S. Ct. at 2958.[3]

---

[3]     We are aware that in both Penry and State v. Laney, 654 S.W.2d 383 (Tenn. 1983), the appellate court's task was to determine whether the death penalty could be imposed upon a mentally retarded defendant without violating constitutional provisions against cruel and unusual punishment. On this issue, the courts were reviewing only the sentencing activities of the lower courts. Nevertheless, we believe these analyses are germane to the evidence question before us in the present case. Under Tennessee law, the defense of insanity and the admissibility of expert evidence to negate a mens rea element of the crime are both founded upon the presence of "mental disease or defect." See Tenn. Code Ann. § 39-13-501(a); Hall, 958 S.W.2d at 690. In Laney, the Tennessee Supreme Court was faced with the "mental disease or defect" formulation because it was contained in the prescribed mitigating factors for capital cases. Laney, 654 S.W.2d at 389 (quoting former Tenn. Code Ann. § 39-2404(j)(8) (providing for jury consideration that "[t]he capacity of the defendant to appreciate the wrongfulness of his conduct or to conform to the requirements of law was substantially impaired as a result of mental disease or defect or intoxication which was insufficient to establish a defense to the crime but which substantially affected his judgment)). In Penry, the high court's inquiry into the legitmacy of capital punishment for mentally retarded defendants led it to fathom the nature and meaning of the "defect" aspect of the traditional insanity defense, in view of Penry's mental retardation and the prohibition against imposing death penalties on insane defendants. See Ford v. Wainwright, 477 U.S. 399, 106 S. Ct. 2595 (1986). Because "mental defect" is the rubric through which mental retardation is embraced within the insanity defense to criminal liability, the court proceeded to explain that the legal phrase "mental defect" is linked traditionally with only the severest forms of mental retardation. Thus, in Penry and Laney, the courts explained or illustrated the meaning of "mental defect," the critical phrase for this court's task in the present case. Whether a court is admitting evidence, determining guilt, or in some cases, imposing a sentence, see Laney, 654 S.W.2d at 389, mental retardation enters into the court's consideration through the threshold of mental defect.

Mental retardation is defined as:

> A.   Significant subaverage intellectual functioning: an IQ of approximately 70 or below on an individually administered IQ test . . . [and]
> B.   Concurrent deficits or impairments in present adaptive functioning (i.e., the person's effectiveness in meeting the standards expected for his or her age by his or her cultural group) in at least two of the following areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety [and]
> C.   The onset is before age 18 years.

American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders, Number 4, Diagnostic Criteria 50 (1995).  IQ scores from approximately 70 down to 50-55 suggest mild retardation; 50-55 down to 35-40, moderate mental retardation; 35-40 down to 20-25, severe mental retardation; and below 20-25, profound mental retardation.  Id.

Dr. Auble characterized the petitioner as borderline mentally retarded. She did not specify the adaptive functioning areas in which she found him deficient, but his illiteracy may indicate a deficiency in "functional academic skills."  That deficiency along with, for instance, a deficiency in communication and an IQ score of 70 apparently would qualify the petitioner as borderline mentally retarded.  It can be seen readily that such a classification does not mean the petitioner is incapable of conducting many life activities.

In Penry, the defendant's IQ was between 50 and 63, and at 22 years of age, he was characterized as having the mental age of a 6 ½-year-old person. "Penry's social maturity, or ability to function in the world, was that of a 9 or 10-year-old."  Penry, 492 U.S. at 307-08, 109 S. Ct. at 2941.  Nevertheless, the Supreme Court observed that Penry was found competent to stand trial, and the high court held that Penry was subject to the ultimate criminal sanction.  In effect, he was not hampered by any "mental disease or defect."  Id. at 338-40, 109 S. Ct. at 2957-58; accord  State v. Laney, 654 S.W.2d 383 (Tenn. 1983) (defendant diagnosed as "borderline mentally retarded" with IQ of 72 subject to death penalty).

12

In the present case, Dr. Auble concurred in the pretrial findings that the petitioner was competent to stand trial and was not a candidate for an insanity defense. Nothing in the record suggests that the petitioner lacked the "capacity to appreciate the wrongfulness of [his] actions." See Penry, 492 U.S. at 333, 109 S. Ct. at 2954. Therefore, the record fails to establish that, because of mental disease or defect, the petitioner lacked the capacity to intend the killing.

We have considered whether the record establishes the required mental incapacity based upon the aggregate of the various factors. Dr. Auble testified that some of the factors exacerbated the others. However, her opinion of incapacity is in no way grounded upon the findings and exposition of mental disease or defect. Without such a foundation, Dr. Auble's testimony did not surpass the threshold for the admission of expert evidence to negate a criminal mens rea element. See State v. Leroy Hall, Jr., No. 03C01-9303-CR-00065, slip op. at 17 (Tenn. Crim. App., Knoxville, Dec. 30, 1996) (expert evidence that personality makeup would cause the defendant to act in a certain way "misleads the jury regarding the defendant's mental state because it . . . bears no relevance to whether the defendant was capable of forming the requisite mental state"), aff'd, 958 S.W. 2d 679 (Tenn. 1997); State v. Shelton, 854 S.W.2d 116, 122 (Tenn. Crim. App. 1992). For this reason the record does not establish that counsel was ineffective for failing to mount an attack of this nature on the required mental element of first degree murder.

Because the record in this post-conviction case does not establish that trial counsel was ineffective in failing to assert a broad attack upon the defendant's capacity to intend murder, we discern no basis in the record for concluding that the trial court should have generally instructed the jury about such capacity. At trial, the defendant raised the narrow "capacity" issue of voluntary intoxication, and the trial court fully and adequately instructed the jury on this issue. Moreover, the trial court properly instructed the jury as to the state's burden of proving the elements of the

offense beyond a reasonable doubt. The record evinces no basis for further instructing the jury about the defendant's lack of capacity to intend first degree murder. On this issue, ineffective assistance of counsel has not been shown.

## II.

In the petitioner's second issue, he asserts ineffective assistance because trial counsel failed to make an opening statement. Trial counsel testified that he did not wish to raise issues via an opening statement which he might not be able to prove, especially in view of the uncertain status of the petitioner's wife as a witness, and he did not wish to tip his defensive hand to the state. The trial court deferred to this decision as trial strategy after hearing trial counsel's testimony. The evidence does not preponderate against this finding. Trial counsel will not be second-guessed in matters of strategy when it appears counsel made an informed choice based upon adequate preparation. Henley, 960 S.W.2d at 579; Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982).

## III.

The judgment of the trial court is affirmed.

_____
JAMES CURWOOD WITT, JR., Judge

CONCUR:

_____
DAVID G. HAYES, Judge

_____
JOHN EVERETT WILLIAMS, Judge

14